UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FIRAS (JASON) YALDO,

Plaintiff,

v.

WAYNE STATE UNIVERSITY, ET AL.,

Defendant.

_____/

Case No. 15-cv-13388

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
ANTHONY P. PATTI

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [3] AND DENYING PLAINTIFF'S REQUEST THAT THE COURT ORDER DEFENDANTS TO SHOW CAUSE**

**I. INTRODUCTION**

Firas (Jason) Yaldo ("Plaintiff") commenced the instant action against his former medical school, Wayne State University School of Medicine, and its staff (collectively "Defendants") on September 25, 2015. *See* Dkt. No. 1. In the Complaint, Plaintiff alleged that Defendants violated his First Amendment rights (Count I), deprived him of due process rights (Count II), discriminated against his ethnicity and religion in violation of the Michigan Elliott-Larsen Civil Rights Act (Count III), committed intentional infliction of emotional distress (Count IV), and engaged in conspiracy (Count V).[1] *See id*. at ¶¶ 69–79 (Pg. ID No. 36–37). In Count VI of his Complaint, Plaintiff brought a claim for an injunction to be allowed to enroll in a Pathobiology course, beginning October 16, 2015. *See id*. at ¶ 81 (Pg. ID No. 38).

Presently before the Court is Plaintiff's Motion for Preliminary Injunction [3], in which he requested the Court order Defendants to Show Cause why an injunction should not be issued

---

[1] Plaintiff states on page two of the Complaint that it was brought pursuant to the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Dkt. No. 1 at ¶ 1 (Pg. ID No. 2). Plaintiff does not mention either of those acts again in his Complaint. *See id*.

to reinstate him into medical school. Dkt. No. 3. The Court initially scheduled a hearing on this Motion on October 8, 2015, *see* Dkt. No. 6; however, this hearing was subsequently cancelled due to concern that Defendants were not adequately notified. On October 6, 2015, Plaintiff submitted an Amended Complaint [7][2] and three new exhibits. *See* Dkt. No. 7, 8. Later that day, Defendant WSU submitted a Response Opposing Plaintiff's Motion for Preliminary Injunction [10].[3] Dkt. No. 10. After considering the motion, response, and applicable law, the Court will **DENY** Plaintiff's Motion for Preliminary Injunction [3] and **DENY** his request that the Court Order Defendants to Show Cause. The Court's reasoning is set forth in detail below.

## II. BACKGROUND

Plaintiff matriculated at Wayne State University School of Medicine ("SOM") in fall 2012. *See* Dkt. No. 1, Ex. 18 (Pg. ID No. 93). Within his first few months of classes, concerns arose regarding his professionalism due to his numerous absences, tardiness in making up missed exams, and other issues.[4] *See id.* Plaintiff felt victimized by his professors and school administrators, leading him to seek medical treatment for anxiety. *See* Dkt. No. 7 at ¶¶ 16–28 (Pg. ID No. 210–13). In one of these encounters, Plaintiff felt discriminated against by Defendant Matt Jackson, Assistant Dean of Basic Science Education, because Jackson called Plaintiff by his given name, rather than the name Plaintiff preferred to be called, and

---

[2] Plaintiff's Amended Complaint still maintains that it was brought pursuant to "Americans with Disabilities Act (ADA) & § 504 of the Rehabilitation Act," but does not bring any claims under those statutes. See Dkt. No. 7 at ¶ 1 (Pg. ID No. 208).

[3] Defendant's Response also argues that Wayne State University is not a "person" that can be sued under § 1983 and that there is no respondent superior liability in this matter. *See* Dkt. No. 10 at iii–iv (Pg. ID No. 284–85).

[4] Plaintiff contends the packet summarizing his academic history and professionalism at SOM contained "improper, false, and inaccurate information." Dkt. No. 7 at ¶ 50 (Pg. ID No. 228). He has provided explanations for some of the information in the summary, but has not disputed the fact that he was the subject of a Professionalism Committee hearing on November 30, 2012 for charges including "disrespect to cadaver" (for bringing his mother in to Gross Anatomy lab on a Sunday to look at the cadavers) and an "excessive number of excused exam absences." *See id.*, Ex. 18 (Pg. ID No. 93); *contra* Dkt. No. 7 at ¶ 55 (Pg. ID No. 230–38).

mispronounced it. *See id*. at ¶¶ 16–18 (Pg. ID No. 210–11). Another conflict arose when Plaintiff missed several Histology tests and a make-up examination session,[5] and then felt pressured into taking the make-up test before he felt prepared. *See id*. at ¶ 20 (Pg. ID No. 211). Plaintiff asserts that he reported his need for accommodations for anxiety shortly after this occurrence in late November 2012, *see id*. at ¶ 29 (Pg. ID No. 213), but was not accommodated until December 2014.[6] *See id*. at ¶ 31 (Pg. ID No. 213).

Plaintiff's pattern of missing originally scheduled exam dates continued during his time at SOM, totaling 44 absences—28 of which were missed exams[7]—by Defendants' count at his dismissal hearing. *See id*., Ex. 18 (Pg. ID No. 94). Plaintiff felt that Defendants punished him by forcing him to take make-up exams on dates he felt were unreasonable or random. *See* Dkt. No. 7 at ¶ 33 (Pg. ID No. 213). Plaintiff also complained that there were technological problems, such as multiple exams appearing on his exam screen, and that he was verbally accosted and embarrassed just prior to exams.[8] *See id*. at ¶ 40 (Pg. ID No. 215–18). Conversely, Defendants

---

[5] It appears that the tests in question are the third and fourth Histology exams, scheduled for October 23, 2012 and November 9, 2012, respectively. Dkt. No. 1, Ex. 5 (Pg. ID No. 59). Plaintiff appears to have been automatically scheduled to make-up the third exam on November 6, 2012, *see id*. at Ex. 3 (Pg. ID No. 51), but was also absent for this make-up exam. *See id.*, Ex. 2 (Pg. ID No. 48). According to SOM's Policies and Procedures Manual, this second absence from taking the third exam would trigger a "customized exam schedule" being developed. *See id*., Ex. 4 (Pg. ID No. 56). Plaintiff asserts he should have been allowed to push the exam to the next make-up exam date a month later on December 5, 2012, but was pressured by Defendant Connors to take the make-up exam on November 20, 2012. *See* Dkt. No. 7 at ¶ 20 (Pg. ID No. 211). However, Defendants stated that Plaintiff misunderstood the school's policy on "custom" exam schedules, as it appears that it is not standard for students to unilaterally select their own make-up dates. *See* Dkt. No. 10, Ex. U (Pg. ID No. 443).

[6] The Court takes into account evidence submitted by Plaintiff in determining the validity of this allegation, as exhibits show that his accommodation request with Student Disability Services is dated in the period around December 2014 to January 2015. *See* Dkt. No. 1, Ex. 10, 11 (Pg. ID No. 73, 75).

[7] To put this number in perspective, Plaintiff's Exhibit 5 shows that there are about 22 exams scheduled for Year 1 students matriculated at the regular academic pace. (Pg. ID No. 59). Plaintiff was placed in a decelerated program, Dkt. No.7 at ¶ 23 (Pg. ID No. 212), so it appears that he was given two years to complete the 22 exams required of Year 1 students. *See* Dkt. No. 1, Ex. 18 (Pg. ID No. 90). Defendant's Response notes that Plaintiff was "provided in excess of 50 opportunities to complete the 24 exams" required of second year students, but only completed 20. Dkt. No. 10, Ex. A.

[8] Plaintiff provides no information or evidence regarding how he was verbally accosted or embarrassed in ¶ 40(E). Dkt. No. 7 (Pg. ID No. 217).

-3-

asserted Plaintiff failed to comply with SOM policy that he make-up missed exams in a timely manner. *See* Dkt. No. 1, Ex. 7, Ex. 8 (Pg. ID No. 67, 69).

The conflicts between Plaintiff and Defendants appear to have continued throughout each school year, getting progressively worse over the past year. In August 2014, Plaintiff was enrolled in the course Immunology/Microbiology/Infectious Disease ("IMID"), which concluded on September 10, 2014. *See* Dkt. No. 1, Ex. 41 (Pg. ID No. 170). Plaintiff missed the Unit 2 exam, scheduled August 22, 2014, and the final NBME exam, scheduled September 9, 2014. *See id.* It took Plaintiff over four months to make up those exams, in January 2015.[9] *See id.* Plaintiff failed IMID and subsequently appealed his grade, claiming that the course grades were incorrectly calculated and SOM personnel hindered his performance in the course. *See* Dkt. No. 7 at ¶ 45 (Pg. ID No. 224–27). Additionally, Plaintiff filed a complaint against the IMID course instructor, Defendant Jackson, with the WSU Office of Equal Opportunity (OEO) in January 2015, prior to his appeal. *See id.* at ¶ 45(A) (Pg. ID No. 224). After his initial appeal of the IMID grade was denied, he appealed to the Basic Science Committee, which also denied his appeal. *See id.* at ¶ 45(E–H) (Pg. ID No. 225). He then appealed his grade to the Vice Dean of Medical Education, Defendant Maryjean Schenk, who denied his appeal, *see* Dkt. No. 1, Ex. 18 (Pg. ID No. 95), and finally submitted an untimely appeal of the course grade to the Associate Provost, who also denied it.[10] *See id.* (Pg. ID No. 96–97).

Meanwhile, Defendants worked with Plaintiff to get him on track to completing his outstanding missed exams. Defendants permitted Plaintiff to create a custom make-up exam

---

[9] This is counter to the SOM's policy that required all course work and examinations be completed within 30 days of the end date of the course, which would have required Plaintiff to take these exams by October 9, 2014. *See* Dkt. No. 1, Ex. 9 (Pg. ID No. 71); WAYNE ST. UNIV. SCH. MEDICINE, *Assessment of Student Performance: WSUSOM Examination Policies*, http://www.asp.med.wayne.edu/assessment-of-student-performance.php (last visited Oct. 7, 2015).

[10] Plaintiff contends that his appeal was timely because Defendant Schenk reviewed the matter again as a courtesy on May 11, 2015. *See* Dkt. No. 7 at ¶ 45(K) (Pg. ID No. 226–27).

schedule of his own choosing, *see id*., Ex. 12 (Pg. ID No. 78), which he subsequently did not follow due to more absences. *See id*; Dkt. No. 10, Ex. A at ¶ 8 (Pg. ID No. 318).

On June 12, 2015, Plaintiff received a letter from Defendant Schenk that his academic record would be reviewed before the Promotions Committee ("the Committee") on July 10, 2015. *See* Dkt. No. 1, Ex. 16 (Pg. ID No. 86). He was invited to attend and present at the meeting, which he chose to do, along with his parents and legal counsel. *See id*., Ex. 18 (Pg. ID No. 98–100). That same day, the Committee decided to dismiss Plaintiff from medical school based on his entire academic record, including a record of professionalism issues. *See id*., Ex. 17 (Pg. ID No. 88). He appealed this decision to the Vice Dean of Medical Education and was denied on August 3, 2015. *See* Dkt. No. 7, Ex. 46 (Pg. ID No. 261). He then appealed again in September to the Dean of the Graduate School, the final step in the appeal process. *See* Dkt. No. 1, Ex. 34 (Pg. ID No. 145–46). Plaintiff's appeal was denied on September 18, 2015, on the ground that all processes and procedures were correctly followed by SOM when handling his dismissal and review of the dismissal. *See id*.

Plaintiff filed the instant case in federal district court one week later, on September 25, 2015. *See* Dkt. No. 1 (Pg. ID No. 39).

### III. DISCUSSION

#### A. Plaintiff's Request that Defendant Be Ordered to Show Cause Why Plaintiff Should Not Be Reinstated Will Be Denied

In his Motion for Preliminary Injunction, Plaintiff moves the Court pursuant to Federal Rule of Civil Procedure 65 for "an Order to Show Cause why an injunction should not issue against the Defendants reinstating him to the Wayne State University School of Medicine (SOM) so that he can retake the pathobiology course scheduled to begin on October 16, 2015." Dkt.

No. 3 at 2. Simply put, such a request is not proper in a Rule 65 Motion for Preliminary Injunction.

Rather, a Motion for Preliminary Injunction requires that the movant state the reasons why the injunction should issue, state its terms specifically, and describe the acts or acts required in reasonable detail, without merely referring to the complaint or other documents. *See* FED. R. CIV. P. 65(d)(1). Since Rule 65 does not allow Plaintiff to shift the burden of proof onto non-moving parties, the Court will deny his request for an Order to Show Cause.

### B.  Preliminary Injunction Will Be Denied

"A preliminary injunction is an extraordinary measure that has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.' " *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)). This equitable remedy preserves the relative positions of the parties until further proceedings on the merits can be held. *See id.* Whether to grant such relief is a matter within the discretion of the district court. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 540 (6th Cir. 2007). Four factors are balanced in determining whether to grant a request for a preliminary injunction. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Those factors are:

> (1) whether the movant is likely to succeed on the merits
> (2) whether the movant is likely to suffer irreparable harm in the absence of preliminary relief;
> (3) whether the balance of equities tips in the movant's favor; and
> (4) whether issuance of an injunction is in the public interest.

*See id.*

"Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners,* 225 F.3d 620,

625 (6th Cir. 2000). The court should first address whether the movant shows a substantial likelihood of success on the merits. *See Bonnell*, 241 F.3d at 809. This is because a successful showing that a constitutional right is being threatened or impaired mandates a finding of the second factor, irreparable injury. *See id*. (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Applying the factors, the Court does not find that injunctive relief is appropriate at this juncture.

### 1.  Plaintiff Does Not Demonstrate A Likelihood Of Success On The Merits.

First, the Court must determine whether the movant has demonstrated a likelihood of success on the merits. *See Winter*, 555 U.S. at 21. Plaintiff argues that his Complaint demonstrates his need for and entitlement to injunctive relief. Dkt. No. 3 at 2. In his Complaint, Plaintiff brings two federal claims and three state claims over which the Court would presumably have supplemental jurisdiction. *See* Dkt. No. 1 (Pg. ID No. 36–37). Although the Court will consider all of Plaintiff's claims in evaluating his likelihood of success, the federal claims will be prioritized in this review because a valid federal claim is necessary for the Court to maintain jurisdiction over the case. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966) (stating that if federal claims are dismissed before trial or if state issues substantially predominate, state claims should be dismissed to be resolved by a state court). "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Id*. at 726.

Keeping these standards in mind, the Court does not find that Plaintiff has a strong likelihood of success on the merits after reading his briefs. Plaintiff's Motion states that "[h]e has an excellent chance for success on the merits inasmuch as the Defendants recognize that he has an anxiety disability which requires accommodation and, as detailed in the Complaint, the school has not only not provided an accommodation, it has affirmatively undertaken actions reasonably

expected to increase his anxiety." Dkt. No. 3 at ¶ 5. Similarly, Plaintiff's Complaint, upon which he relied in his Motion for Preliminary Injunction, appears to focus on his anxiety disability and whether Defendants accommodated him in accordance with federal law. *See* Dkt. No. 7 at ¶¶ 1, 31, 35 (Pg. ID No. 208, 213–14). Yet, there are no ADA claims listed in the Complaint.[11] Instead, his federal claims allege that Defendants retaliated against him for protected speech activity (Count I) and violated his due process rights (Count II). *Id*. at ¶¶ 68–72 (Pg. ID No. 245–46).

### a. Plaintiff Has Not Established Any Likelihood Of Success On His First Amendment Claim.

Plaintiff first claims that Defendants retaliated against him for constitutionally protected speech. *Id*. at ¶ 71. Plaintiff must allege the following three factors to adequately plead a First Amendment retaliation claim:

(1) the plaintiff engaged in constitutionally protected conduct;
(2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and
(3) the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012) (citing *Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005); *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). If Plaintiff can establish that his protected conduct was a motivating factor behind his dismissal, the burden shifts to Defendants. *Thaddeus–X*, 175 F.3d at 399 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). Defendants must then show that they would have taken the same action in the absence of the protected activity. *Thaddeus–X*, 175 F.3d at 399.

---

[11] As noted previously, the Complaint states that "This is a Complaint brought pursuant to 42 U.S.C. § 1983, the *Americans with Disabilities Act* (ADA) and *§ 504 of the Rehabilitation Act*, the Michigan Elliot-Larsen [sic] Civil Rights Act and the common law," Dkt. No. 1 at ¶ 1 (Pg. ID No. 2) (emphasis added); Dkt. No. 7 at ¶ 1 (Pg. ID No. 208), but no claims under the ADA or Rehabilitation Act were pled.

First, it must be established that Plaintiff engaged in protected conduct. *See Wurzelbacher*, 675 F.3d at 583. Here, Plaintiff alleges that his continuous complaints and petitions to Defendants resulted in retaliation against him. Dkt. No. 7 at ¶ 70 (Pg. ID No. 245). He asserts that Defendants violated his right to petition for redress of grievances, protected free speech activity under the First Amendment. *Id*; *see* U.S. Const. amend. I ("Congress shall make no law … abridging the freedom of speech … or the right of the people … to petition the Government for a redress of grievances."). Accordingly, if Plaintiff was petitioning Defendants for redress of legitimate grievances, this conduct would qualify as protected speech.[12] Indeed, Plaintiff does state that he filed a complaint with the WSU Office of Equal Opportunity (OEO) against Defendant Jackson three days prior to beginning his appeal of his grade in Immunology/Microbiology/Infectious Disease (IMID). *See* Dkt. No. 7 at ¶ 45(A) (Pg. ID No. 224); Dkt. No. 1, Ex. 18 (Pg. ID No. 94).[13]

---

[12] Plaintiff's complaints regarding his grades fail to rise to the level of protected speech. In *Stephenson v. Central Michigan University*, the district court refused to protect complaints that amounted to "an effort by a student to get judicial review of her academic performance through a First Amendment claim that her gripes ... warrant such review .... These gripes, whether voiced privately or openly, are generally not constitutionally protected speech subject to court review." 897 F. Supp. 2d 556, 566 (E.D. Mich. 2012) (quoting *Heenan v. Rhodes*, 757 F.Supp.2d 1229, 1240–41 (M.D. Ala. 2010)). The Sixth Circuit recognizes an instructor's "broad authority to base her grades for students on her view of the merits of the students' work." *Settle v. Dickson County Sch. Bd.*, 53 F.3d 152, 155 (6th Cir. 1995) (citing *Board of Curators of the U. of Mo. v. Horowitz*, 435 U.S. 78 (1978)). Grades are to be determined by teachers in the classroom, not by judges in the courtroom. *See Settle*, 53 F.3d at 155–56 ("Teachers may frequently make mistakes in grading and otherwise, just as [judges] do sometimes in deciding cases, but it is the essence of the teacher's responsibility in the classroom to draw lines and make distinctions."). A teacher's discretion to award grades and administer discipline related to academic achievement should not be obstructed by the judiciary unless there is clear evidence of improper motive to suppress speech. *See Settle*, 53 F.3d at 155; *Board of Curators of the U. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978) ("Like the decision of an individual professor as to the proper grade for a student in his course, the determination of whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking."). Plaintiff has provided no evidence of Defendants' improper motive or that he was graded any differently than his fellow classmates. Even if "he only failed the IMID course by 0.06%," Dkt. No. 7 at ¶ 45(G) (Pg. ID No. 227), that deficiency is still considered a failing grade by his instructor, who wields broad discretion over course grades.

[13] Plaintiff does not provide any argument that this is the protected speech that resulted in Defendants' alleged retaliation in Count I. Additionally, he does not provide the complaint filed with the WSU OEO against Defendant Jackson or any information regarding the subject matter of that complaint. Plaintiff also alleges that other Defendants were subject to complaints with the Michigan Department of Civil Rights and WSU OEO, *see* Dkt.

-9-

Second, the Court must examine whether Defendants took an adverse action against Plaintiff that would deter a person of ordinary firmness from continuing to engage in protected conduct. *See Wurzelbacher*, 675 F.3d at 583. "Adverse action" has traditionally referred to actions such as "discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010) (quoting *Thaddeus–X*, 175 F.3d at 396). Accordingly, if Plaintiff's dismissal would deter a person of ordinary firmness from engaging in protected speech, it would qualify as an adverse action. The Court will assume that Plaintiff's dismissal would satisfy this prong.

Third, the adverse action against Plaintiff must have been motivated at least in part by his protected conduct. *See Wurzelbacher*, 675 F.3d at 583. It is at this prong that Plaintiff's First Amendment claim substantially unravels. Plaintiff's Complaint does not contain any allegations regarding how his OEO complaint influenced the Promotions Committee's ("the Committee") decision to dismiss him. This complaint does not appear to have been included in the packet of materials that the Committee considered when evaluating his dismissal, nor is there any evidence that it was even mentioned. Instead, the Committee appears to have focused on his three failed courses from the previous semester, history of absences from exams and required sessions, past sanctions from the Professional Committee, and a recent violation of the Student Code of Conduct for submitting a fabricated police report to substantiate an absence. Dkt. No. 1, Ex. 18 (Pg. ID No. 92–94). Since Plaintiff provided no evidence that Defendant was improperly motivated to dismiss him based on protected speech, there is not a strong likelihood that he will be successful in his First Amendment claim.

---

No. 7 at ¶ 43(C), 59 (Pg. ID No. 221, 239), but does not allege that he was the person who made those complaints or how they resulted in any retaliation against him.

**b. Plaintiff Has Not Established A Strong Likelihood Of Success On His Due Process Claim**.

Plaintiff next claims that Defendants violated his due process rights. Dkt. No. 7 at ¶ 72 (Pg. ID No. 245). The Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest."[14] *Warren v. Athens*, 411 F.3d 697, 708 (6th Cir. 2005).

The Court must engage in a three-step inquiry to determine whether an individual has been denied procedural due process. "To establish a procedural due process violation, Plaintiff must demonstrate that (1) [he] possessed a constitutionally protected property or liberty interest; (2) [he] was deprived of that interest; and (3) the state did not afford [him] adequate procedural rights prior to depriving [him] of that interest." *Taylor Acquisitions, L.L.C. v. Taylor*, 313 F. App'x 826, 830 (6th Cir. 2009).

Plaintiff does not elaborate about which fundamental rights he was allegedly denied in Count II, referring only to his previous allegations in the Complaint. *See* Dkt. No. 7 at ¶ 72 (Pg. ID No. 245). Earlier in his Complaint, Plaintiff asserted his due process rights were violated because Defendant Schenk "interrupted and mocked [Plaintiff] at the Promotion Committee hearing, demonstrating her bias."[15] *Id.* at ¶ 59 (Pg. ID No. 239). This allegation does not

---

[14] Plaintiff has not indicated whether he intends his due process claim to arise under a violation of his procedural or substantive due process rights. The Court assumes that he intends to bring a procedural due process claim since he elaborates so thoroughly on the dismissal hearing process. Furthermore, Plaintiff did not identify a specific substantive right of which he had been deprived. To establish a substantive due process claim, Plaintiff would have needed to show that Defendants' determination rested on an academic judgment "beyond the pale of reasoned academic decision making when viewed against the background of his entire career." *See Ewing*, 474 U.S. at 227–28. He has not done so.

[15] One of the two interruptions Plaintiff mentions appears to be when Defendant Schenk gave Plaintiff a five-minute warning regarding the time limit to finish his presentation. Dkt. No. 7 at ¶ 43(F) (Pg. ID No. 222). Plaintiff provides no information regarding what Defendant Schenk did to "mock" him at the hearing.

illustrate a constitutionally protected interest; however, the Supreme Court has previously accepted that continued enrollment in a public educational institution may be a constitutionally protected right, subject to due process protections. *Regents of U. Mich. v. Ewing*, 474 U.S. 214, 222–23 (1985). For the purposes of this motion, the Court will assume that Plaintiff's continued enrollment in medical school is a recognized liberty or property interest.[16] Accordingly, dismissal from medical school would seem to be a deprivation of that interest.

The crucial factor to be considered would then be whether Defendants afforded Plaintiff adequate procedural rights prior to dismissal. *See Taylor Acquisitions,* 313 F. App'x at 830. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961). In academic dismissals, a court "should show great respect for the faculty's professional judgment" and "may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225. "Where dismissals are considered academic in nature, procedural due process does not require a hearing before a decisionmaking body either before or after the termination decision is made." *Fuller v. Schoolcraft Coll.*, 909 F. Supp. 2d 862, 876 (E.D. Mich. 2012) (noting that procedural due process is met in academic dismissals where the student is informed of the nature of the dissatisfaction and the final decision is "careful and deliberate").

"Disciplinary dismissals, being more objective in nature and not dependent upon the analytical expertise of professional academicians," require higher standards of protection. *See Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005). "The hearing, whether formal, informal, live or

---

[16] Plaintiff's Complaint does not mention the words typically found in a due process claim, such as "liberty," "property," or "fundamental," so the Court must guess as to which interest Defendants allegedly deprived Plaintiff.

not, must be meaningful and must provide the accused with the opportunity to 'respond, explain, and defend.' " *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005) (detailing the more searching inquiry required for disciplinary expulsion, as opposed to academic dismissal). At a disciplinary hearing, the student has a right to be present for all significant portions of the hearing, but the university need not allow active representation by legal counsel. *Id.* at 635–36. Due process generally does not require that a student be allowed to appeal the school's decision, so long as that outcome was reached through constitutional procedures. *Id.* at 636.

There are several cases on point regarding the procedures that a student is entitled to prior to dismissal from a public university. *See Ewing*, 474 U.S. at 225 (finding no due process violation where the record demonstrated that "the faculty's decision was made conscientiously and with careful deliberation, based on an evaluation of the entirety of [the student's] academic career."); *Horowitz*, 435 U.S. at 84–85 (finding no due process violation where the school made a "careful and deliberate" decision and "fully informed [the student] of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment"); *Bell v. Ohio St. U.*, 351 F.3d 240, 249 (6th Cir. 2003) (finding due process was satisfied where there were multiple levels of review of a student's failure to comply with requirements and the student had an opportunity to participate in these reviews); *Senu-Oke v. Jackson State Univ.*, 283 F. App'x 236, 240 (5th Cir. 2008) (finding due process was satisfied where a student, dismissed without a hearing for leaving orientation early, had an opportunity to plead his case in writing); *Richmond v. Fowlkes*, 228 F.3d 854, 857 (8th Cir. 2000) (finding due process was satisfied where a student had notice of faculty's dissatisfaction, was given an opportunity to respond in his own defense, and could appeal an adverse decision).

-13-

Here, we see that Plaintiff was afforded procedural due process that exceeded the minimums required in an academic setting. First, he received multiple warnings about missing exams and his failure to promptly take make-up exams. On February 13, 2015, Defendant Bridge emailed Plaintiff about his continued practice of missing make-up examinations and notified him that the school would no longer be granting him excused absences for the remainder of the school year. Dkt. No. 1, Ex. 8 (Pg. ID No. 69). Less than two weeks later, Defendant Booza emailed Plaintiff regarding his difficulty meeting school policies, which required him to take make-up exams in a timely fashion. Dkt. No. 1, Ex. 7 (Pg. ID No. 87).

Second, Plaintiff received both notice and an opportunity to advocate on his own behalf at his dismissal hearing. On June 12, 2015, Plaintiff received a letter notifying him that his academic record would be presented to the Promotions Committee and was encouraged to attend the meeting and provide his perspective. Dkt. No. 1, Ex. 16 (Pg. ID No. 86). Plaintiff appeared and presented before the Promotions Committee on July 10, 2015 with his attorney present,[17] although he notes that only seven of the eight voting members were present and one arrived late.[18] Dkt. No. 7 at ¶ 43(C) (Pg. ID No. 221).

Third, Plaintiff was provided with the option to appeal his dismissal multiple times. When the Committee's decision to dismiss him was issued, Dkt. No. 1, Ex. 17 (Pg. ID No. 88), Plaintiff was promptly emailed and provided with instructions about how to appeal the decision to the Vice Dean of Medical Education. Dkt. No. 1, Ex. 35 (Pg. ID No. 148). When Plaintiff's

---

[17] Plaintiff complains that his presentation was "interrupted more than one time" and was "truncated." Dkt. No. 7 at ¶ 43(A, C) (Pg. ID No. 221). Due process does not guarantee that individuals will be free from interruptions at hearings, nor does it guarantee that they will be given unlimited time to present their objections.

[18] Failure by the Committee to have perfect attendance on the day of Plaintiff's hearing is not a due process violation. The link provided by Plaintiff in his Amended Complaint does not establish that the Committee failed to reach a quorum necessary to vote on his dismissal. See Dkt. No. 7 at ¶ 43(C) (Pg. ID No. 221). Rather, the website Plaintiff cited states that "[a] quorum of at least five voting members is required for a Promotions Committee meeting." Since Plaintiff's dismissal hearing had seven voting members present, it appears his hearing was fully in accordance with Committee procedure.

counsel errantly instructed him to appeal based on instructions from an old source, Defendants'
General Counsel extended Plaintiff's deadline to appeal.[19] Dkt. No. 1, Ex. 36 (Pg. ID No. 151).
After that appeal was denied, he was given another opportunity to appeal the Committee's
decision to the Associate Dean and Dean of the Graduate School.[20] Dkt. No. 1, Ex. 34 (Pg. ID
No. 145). The Associate Dean's consideration of Plaintiff's appeal was the final step in the
appeal process and was denied on September 18, 2015. *Id*. (Pg. ID No. 145–46).

Viewed as a whole, Defendants offered Plaintiff sufficient notice and opportunity to
voice his concerns at the dismissal process. Defendants evaluated the entirety of Plaintiff's
academic record, including his 28 missed exams, in addition to his previous sanction from the
Professionalism Committee, recent Code of Conduct violation, and three failed courses. Dkt.
No. 1, Ex. 18 (Pg. ID No. 93–94). Plaintiff argues, without citing to evidence, that a student
would not be required to appear before the Promotions Committee for a hearing "unless he or she
had failed MORE than three courses." Dkt. No. 7 at ¶ 42(A) (Pg. ID No. 218–19). However,
there is no evidence that the Committee's authority to consider a student's academic record is
limited solely to those students who failed at least four courses.

In fact, the Promotion and Graduation requirements state that in order to be promoted
from year to year, each student needs to achieve a satisfactory or honors grade in all prescribed
courses, complete all required assignments, meet all attendance requirements and satisfactorily

---

[19] Plaintiff's psychotherapist wrote a letter recommending that Plaintiff be given ten additional days to appeal the
Committee's decision due to his anxiety. Dkt. No. 1 at Ex. 30 (Pg. ID No. 131). The Court notes that Defendants did
give Plaintiff additional time to appeal, although not the entire period suggested by his psychotherapist. *See* Dkt.
No. 1, Ex. 36 (Pg. ID No. 151).

[20] Plaintiff alleges that Defendant Mathur was "compromised" because her children attended the medical school
with Plaintiff and could be negatively impacted if she decided against the medical school. Dkt. No. 7 at ¶ 64 (Pg. ID
No. 240). This allegation of bias was unsupported by any evidence and does not rise to the level of being arbitrary
and capricious. Mathur clearly stated the pieces of the record considered in her decision and the parts of the record
that led her to support the Committee's decision to dismiss Plaintiff. *See* Dkt. No. 1, Ex. 34 (Pg. ID No. 145).
Plaintiff's claim that Mathur was not objective seems to be based solely on the fact that she did not agree with the
arguments in his appeal letter. *See id*. at ¶ 66.

complete all make-up provisions, and meet professional guidelines. *See* Dkt. No. 10, Ex. O (Pg. ID No. 397). The Committee may meet to determine the disposition of students who fail to meet requirements for promotion or whose behavior is inconsistent with the School's professional standards. *See id.* According to the facts alleged in Plaintiff's own Complaint, he does not meet the above standards due to his failure to complete all his make-up exams. Just because Defendants were not persuaded by Plaintiff's arguments at the hearing and on appeal does not mean that they failed to deliberate carefully and conscientiously.

Plaintiff alleges that the June 12, 2015 letter, which advised him that his "academic performance/academic progress" would be presented to the Promotion Committee, failed to note that his professionalism would also be considered. Dkt. No. 7 at ¶ 43(D) (Pg. ID No. 222). He contends this prevented him from addressing professionalism in his presentation. *Id.* On this point, the Sixth Circuit has been clear: a "professionalism determination is an academic judgment." *Al-Dabagh v. Case W. Reserve U.*, 777 F.3d 355, 360 (6th Cir. 2015) *cert. denied*, 135 S. Ct. 2817 (2015) ("We repeatedly have emphasized that 'academic evaluations' may permissibly extend beyond 'raw grades [and] other objective criteria.' "). When the letter stated that his academic performance and progress were to be considered, his professionalism was inherently implied.

Academic determinations, including consideration of a student's professionalism, should be overturned by the courts only if they substantially depart from accepted academic norms. *See id.* (finding a medical school's dismissal of a student with an excellent academic record was not arbitrary and capricious in light of evidence of the student's frequent tardiness, complaints from fellow students and hospital staffers, and criminal conviction). Although it would have been helpful for Plaintiff to have been provided the packet of information to be considered by the

-16-

Committee in advance of the hearing, the Court cannot say that this failure to share materials in advance was a substantial deviation from accepted norms in academia. Since Plaintiff was provided a level of protection sufficient to meet even the stricter standard required for disciplinary dismissal—as opposed to his dismissal for academic reasons—his due process claim is unlikely to succeed.

### c. Plaintiff Has Not Established A Strong Likelihood Of Success On His State Law Claims.

Plaintiff's state law claims arise under the Michigan Elliott-Larsen Civil Rights Act and common law. *See* Dkt. No. 7 at ¶¶ 73–78 (Pg. ID No. 246). With regard to his civil rights claim, he asserts that Defendants discriminated against him based on his ethnicity, as a citizen of Iraqi and Chaldean[21] origin, and religion. *See id.* at ¶ 74 (Pg. ID No. 246). Plaintiff's only allegation in support of his ethnicity-based civil rights claim is the contested claim that Defendant Jackson accused him of being ashamed of his heritage by preferring a name other than his given name. *See id.* at ¶ 16 (Pg. ID No. 210); Dkt. No. 10 at 23 (Pg. ID No. 311).

Absent direct evidence of discrimination,[22] claims under the Elliott-Larsen Civil Rights Act are subject to the tripartite *McDonnell Douglas* burden-shifting framework. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). "Under this framework, the plaintiff bears the initial 'not onerous' burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence." *Id.* (citing *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To establish a *prima facie* case of discrimination, a plaintiff must show that he or she was treated differently than similarly situated individuals. *See Sirpal v. U. of Miami*, 509

---

[21] Plaintiff's Amended Complaint notes that he is of Chaldean origin, whereas his original Complaint claimed he was of Chadian origin. *Compare* Dkt. No. 7 at ¶ 74 (Pg. ID No. 246) *to* Dkt. No. 1 at ¶ 75 (Pg. ID No. 37).

[22] Plaintiff has not provided the Court with any direct evidence of discrimination based on his ethnicity or religion. In fact, there was no mention whatsoever about his religion in his Complaint, aside from the word "religion" appearing in his Elliott-Larsen Civil Rights Act claim. *See* Dkt. No. 7 at ¶ 74 (Pg. ID No. 246).

F. App'x 924, 928 (11th Cir. 2013). Plaintiff has not pled any facts that indicate he was treated differently from similarly situated medical students of different ethnic origins or religious orientations, and thus the Court's inquiry ends here.

Finally, to prevail on his claim for intentional infliction of emotional distress, Plaintiff must demonstrate: " '(1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff.' " *Armstrong v. Shirvell*, 596 F. App'x 433, 451 (6th Cir. 2015) (quoting *Lucas v. Awaad*, 299 Mich. App. 345, 830 N.W.2d 141, 150 (2013)). Plaintiff has failed to offer sufficient evidence of extreme and outrageous conduct, so this claim is also unlikely to succeed on the merits.

In light of these facts and Plaintiff's small likelihood of success on each of his claims,[23] the Court finds that this factor does not support the issuance of preliminary injunctive relief at this time.

### 2. Plaintiff Is Unlikely to Suffer Irreparable Injury Without A Preliminary Injunction.

Second, the Court considers whether the movant is likely to suffer irreparable harm in the absence of preliminary relief. *See Winter*, 555 U.S. at 20. To satisfy the second factor, a party must demonstrate that unless the injunction is granted, he or she will suffer " 'actual and imminent harm' rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). "An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against *injuries*

---

[23] In Plaintiff's Motion for Preliminary Injunction, he states that "[h]e has an excellent chance for success on the merits inasmuch as the Defendants recognize that he has an anxiety disability which requires accommodation and, as detailed in the Complaint, the school has not only not provided an accommodation, it has affirmatively undertaken actions reasonably expected to increase his anxiety." Dkt. No. 3 at 2–3. This may have been arguable if Plaintiff included a disability claim under statutes such as the ADA and Rehabilitation Act; however, a disability claim was not included in his Complaint. The Court will have to evaluate his chance of success based on the claims he asserted, rather than those that were not included.

*otherwise irremediable*.' " *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)) (emphasis added). "[E]conomic loss does not constitute irreparable harm, in and of itself." *State of Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987).

Plaintiff argues that he will suffer grievous harm if the Court does not issue an injunction allowing him to enroll in the Pathobiology class. Dkt. No. 3 at 2. He claims that the course offered this fall at SOM is necessary to complete his studies and may enable him to transfer to another medical school. *Id*; *see also* Dkt. No. 7 at ¶ 80 (Pg. ID No. 247) ("[T]he harm is irreplable [sic] if Plaintiff cannot complete his Pathobiology course beginning October 16, 2015 thereby either aborting his medical education completely or costing him significant loss and delay in obtaining of his medical degree and professional status."). Without an injunction, Plaintiff claims that he may not be able to complete his education at an American medical school, despite several years of progress towards this goal. *See* Dkt. No. 7 (Pg. ID No. 208).

Meanwhile, Defendant WSU claims that Plaintiff's harm is not irreparable because he could be reinstated at the conclusion of a trial on the merits and he is able to be compensated monetarily for wages lost in the interruption. *See* Dkt. No.10 at 15–16 (Pg. ID No. 303–04). Furthermore, Defendant states that Plaintiff is not even eligible to retake Pathobiology until he retakes the prerequisite for the course, IMID, which he also failed.[24] *See id*. at 16 (Pg. ID No. 304). Since IMID will not be offered again until August 2016, Defendants argues that there is no time pressure for the extraordinary remedy sought by Plaintiff. *Id*.

Accordingly, since Plaintiff is not eligible to retake Pathobiology until he retakes and passes IMID in August 2016, he does not qualify for the relief he seeks. Furthermore, it would be

---

[24] "SoM policy requires failed classes to be retaken in the order of failure, which would mean that plaintiff would need to first take and pass IMID before he could retake Pathobiology … Additionally, the Pathobiology class plaintiff asks that the Court order him into is offered every year." Dkt. No 10 at 16 (Page ID # 304).

possible for the Court to reinstate him at a later date if he prevails on the merits of his case, so his injury cannot be considered to be irreparable. The Court does not find that this factor weighs in Plaintiff's favor.

### 3. Balance of the Equities and the Public Interest Weigh Against Issuance of the Injunction

In the third factor, the Court must consider whether the balance of equities tips in the movant's favor.[25] *See Winter*, 555 U.S. at 20. And finally, in the fourth factor, the Court must consider whether the public interest would be served by the issuance of the injunction. *See id.*

There are competing interests at stake in this case. Although the public clearly has an interest in the enforcement of constitutional rights and state anti-discrimination statutes,[26] the public also has an interest in preserving an educational institution's authority to make academic decisions without interference from the judiciary. *See Ewing*, 474 U.S. at 225; *Al-Dabagh*, 777 F.3d at 359 ("[W]e can no more substitute our personal views for the Committee's when it comes to an academic judgment than the Committee can substitute its views for ours when it comes to a judicial decision."); *Bell*, 351 F.3d at 251–52 (stating that courts are ill-suited to "evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require 'an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking.' "); *Bleicker v. Bd. of Trustees of Ohio State Univ., Coll. of Veterinary Med.*, 485 F. Supp. 1381, 1389 (S.D. Ohio 1980) ("Intervention of the Court into the affairs of the Veterinary College would substantially weaken its legitimate authority among its

---

[25] This third factor refers to "the balance of equities between the movant and other parties, not just third parties to the litigation." *Rinehart v. Scutt*, 509 F. App'x 510, 515 (6th Cir. 2013).

[26] The Court considers the weakness of Plaintiff's current constitutional claims in weighing this interest.

own students and members of the veterinary profession generally, a result that would significantly disserve the public interest."). Defendant asserts that there would be "an understandable loss of confidence in the quality of medical students if WSU were forced to reinstate a student who has already failed multiple courses and violated professionalism policies." Dkt. No. 10 at 24 (Pg. ID No. 312).

Furthermore, as other courts have found, there is a public interest in assuring the competency of medical school graduates, given the long range effects of authorizing individuals to enter into the practice of medicine. *See Betts v. Rector & Visitors of U. of Va.*, 939 F. Supp. 461, 470 (W.D. Va. 1996). Medical schools are far more adept than courts at determining whether a student has the skills, knowledge, and professionalism necessary to practice competently—indeed, it is the school's job to ensure its graduates meet core competencies. *See*, *e.g.*, *Al-Dabagh*, 777 F.3d at 357 (detailing a medical school's curriculum and requirements, including professionalism). In Plaintiff's case, his medical school decided that his sub-par academic record and history of professionalism issues warranted dismissal.

Thus, after balancing the equities and competing public interests at stake, these factors weigh against issuing an injunction.

## IV. CONCLUSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *See Winter*, 555 U.S. at 24. Courts must balance each party's competing claims and consider the impact of granting or withholding the movant's requested relief. *Id*. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id*. (quoting *Romero–Barcelo*, 456 U.S. at 312).

In the present case, Plaintiff has not made a strong showing under any of the four factors weighed when determining whether to issue an injunction. Accordingly, for the reasons discussed herein, the Court will **DENY** Plaintiff's Motion for Preliminary Injunction [3] and **DENY** his request that the Court Order Defendants to Show Cause why an injunction should not issue.

SO ORDERED.

Dated:  October 15, 2015              s/Gershwin A. Drain
        Detroit, Michigan            GERSHWIN A. DRAIN
                                     United States District Judge