UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FIRAS (JASON) YALDO,

Plaintiff,

v.

WAYNE STATE UNIVERSITY, ET AL.,

Defendants.

_____/

Case No. 15-cv-13388

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
ANTHONY P. PATTI

**AMENDED OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS
AND/OR FOR SUMMARY JUDGMENT [70] AND DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [72]**

## I. INTRODUCTION

Firas (Jason) Yaldo ("Plaintiff") commenced the instant action against his

former medical school, Wayne State University School of Medicine, and its staff

(collectively "Defendants") on September 25, 2015. *See* Dkt. No. 1. Plaintiff

initially requested a preliminary injunction ordering his reinstatement into medical

school, Dkt. No. 3, which the Court denied on October 15, 2015. Dkt. No. 23.

Presently before the Court are two motions for summary judgment. On

January 8, 2017, Defendants filed a Motion To Dismiss Pursuant to Federal Rule

of Civil Procedure 12(B)(6) And/Or For Summary Judgment Pursuant to Federal

Rule of Civil Procedure 56. Dkt. No. 70.[1] On January 9, 2017, Plaintiff filed a Limited Motion for Summary Judgment on Counts VII and VIII of Plaintiff's Second Amended Complaint Pursuant To Federal Rule of Civil Procedure 56. Dkt. No. 72. The Court held a hearing on the motions on June 5, 2017 and heard oral arguments from counsel. For the reasons discussed herein, the Court **GRANTS** Defendant's Motion for Summary Judgment [70] and **DENIES** Plaintiff's Motion for Partial Summary Judgment [72].

## II. BACKGROUND

### A. Plaintiff's First Year of Medical School

Plaintiff enrolled at Wayne State University School of Medicine in 2012, after completing undergraduate studies at University of Michigan-Dearborn in 2009.[2] Dkt. No. 83-1, pp. 2–3 (Pg. ID 2352–53); Dkt. No. 83-26, pp. 11–12 (Pg. ID 2768–69). Conflicts between Plaintiff and the medical school arose within his first few weeks of attendance and continued throughout the duration of his studies.

---

[1] The Court interprets Defendants' motion as a motion for summary judgment, pursuant to Rule 56, as it contains 51 exhibits and was filed after Defendants previously answered Plaintiff's Second Amended Complaint. *See, e.g., Joshua Aldridge, et. al., v. City of Warren, et al.*, No. 16-1128, 2017 WL 1048075, at *1–2 (6th Cir. Mar. 20, 2017) (stating that the district court correctly interpreted a defendant's motion for dismissal under Rule 12(b)(6) or alternatively for summary judgment, which included 17 exhibits and was filed after defendants answered the complaint, as a motion for summary judgement under Rule 56).

[2] Plaintiff did not request disability accommodations for computerized exams at University of Michigan-Dearborn or for the two times he took the MCAT. Dkt. No. 82-2, p. 5 (Pg. ID 2222).

In July 2012, Plaintiff signed up to attend a three-day Summer Matriculation Program that required mandatory attendance for participants. Dkt. No. 70-5, p. 2 (Pg. ID 1652). Defendants report that Plaintiff had an unexcused absence from the program, *id.*, but Plaintiff asserts he had permission to leave early to pick up his father from the airport. Dkt. No. 70-38, p. 4 (Pg. ID 1838).

In early August 2012, Plaintiff's academic counselor emailed Plaintiff a warning after speaking with Plaintiff's mother on the phone, because his counselor believed that Plaintiff had shared his email and Blackboard information with his mother. Dkt. No. 70-5, p. 3 (Pg. ID 1653). Later that month, testing staff reported that Plaintiff engaged in suspicious behavior during a restroom break while taking his Gross Anatomy written exam. Dkt. No. 70-5, p. 4 (Pg. ID 1654).

On September 26, 2012, Plaintiff missed his Histology 2 exam. Dkt. No. 70-5, p. 5 (Pg. ID 1655). Plaintiff's parents dropped off a doctor's note with Dr. Matthew Jackson, Assistant Dean of Basic Science Education. *Id.* Plaintiff's student counselor, Kathleen Connors, reminded Plaintiff via email to submit excused absence notes directly to her, as explained at the Summer Matriculation Program and Year 1 Orientation. *Id.* Two days later, on September 28, 2012, Plaintiff's Anatomy Professor reprimanded him for irregular test-taking behavior in his Gross Anatomy practical. *Id.* at 6.

Plaintiff was late to his make-up exam for Histology on October 3, 2012, which he states was because he was not allowed to bring his backpack into the exam room, unlike other students.[3] *Id.*; Dkt. No. 83-26, p. 42 (Pg. ID 2799). Later that month, on Sunday, October 21, 2013, another medical student reported to the Gross Anatomy Course Director that Plaintiff had brought his mother to look at the cadavers in the Gross Anatomy lab. Dkt. No. 70-5, p. 8 (Pg. ID 1658). Plaintiff's mother claims that the security guard allowed her down to the anatomy lab without Plaintiff's help. Dkt. No. 83-25, p. 25 (Pg. ID 2734).

### 1. Professionalism Committee Hearing

In late fall 2012, the medical school began to view Plaintiff's number of excused absences as excessive. Dkt. No. 70-5, p. 11 (Pg. ID 1661) (stating that Plaintiff submitted notes to excuse absences for eight exams in four months). In late October, Jackson informed Plaintiff that he was being referred to the Professionalism Committee. Dkt. No. 70-5, p. 9 (Pg. ID 1659). On November 27, 2012, Plaintiff and Jackson reviewed the charges together and discussed the Professionalism Committee process. Dkt. No. 70-5, p. 12 (Pg. ID 1662).

On November 30, 2012, the Professionalism Committee reviewed nine charges against Plaintiff, including allegations of irregular test-taking, tardiness to exams, sharing private log-in information with his mother, disrespect to cadavers,

---

[3] According to Plaintiff's exhibit, the medical school does not permit backpacks in testing facilities during exams. Dkt. No. 83-28, p. 38 (Pg. ID 2911).

and a high amount of excused absences from exams and required meetings. Dkt. No. 83-24, p. 2 (Pg. ID 2708). After the hearing, the Committee sent Plaintiff a letter on December 5, 2012, notifying him that he had failed to meet the medical school's community standards. Dkt. No. 70-6, p. 2 (Pg. ID 1666).

### 2. Modification of Course Schedule

In November 2012, Connors recommended that Plaintiff take a modified curriculum, wherein he would have two years to complete his Year 1 courses, taking half the courses and exams each year. Dkt. No. 83-5, p. 6 (Pg. ID 2433). Connors stated that she recommended this because Plaintiff was submitting notes for multiple illnesses, there had been a death in his family, and he was barely passing. Dkt. No. 83-5, pp. 6–7 (Pg. ID 2433–34). At that point, Plaintiff had scored below average on every exam. Dkt. No. 70-5, p. 13 (Pg. ID 1663).

On November 15, 2012, Plaintiff emailed Jackson that he "would like to do the modified program." Dkt. No. 70-19, p. 2 (Pg. ID 1775). Plaintiff later asserted that he was forced to modify; however, he also admits that he had a choice, but felt pressured to modify because he thought it would make the school happy prior to his professionalism hearing. Dkt. No. 83-26, pp. 38–39 (Pg. ID 2795–96).

In late November 2012, Plaintiff submitted a letter to Connors from Dr. Mufid Al-Najjar, a psychiatrist. Dkt. No. 70-21, p. 2 (Pg. ID 1781). Al-Najjar stated that Plaintiff suffered from severe anxiety. *Id*. Al-Najjar further

recommended that "special accommodation be provided to [Plaintiff] in the form of relaxed schedule and flexible timing for the required tests," and that Plaintiff's "testing schedule be revised to allow him time to adjust and attain his academic goals." *Id.* Plaintiff was not reminded by the medical school that he needed to make an appointment with Student Disability Services (SDS) for accommodations. *See* Dkt. No. 83-5, p. 8 (Pg. ID 2435). Dr. Lisa MacLean, Assistant Dean of Student Affairs, thought the switch to a modified curriculum already accommodated Plaintiff by reducing his classes and exams by half. Dkt. No. 83-3, pp. 8, 10 (Pg. ID 2369, 2371).

## B. Plaintiff's Second Year of Medical School

By August 2013, Plaintiff had passed half of his first year courses and moved on to the second half of the modified curriculum. Dkt. No. 83-24, p. 2 (Pg. ID 2708). Earlier that summer, Plaintiff began to see a Psychiatric Social Worker, Jeffery DeVore, for anxiety and depression. Dkt. No. 70-46, p. 2 (Pg. ID 1886). By September 16, 2013, DeVore recommended that Plaintiff be admitted to partial hospital care because his symptoms had worsened. Dkt. No. 83-8, p. 16 (Pg. ID 2512). On February 6, 2014, Plaintiff had an appointment with DeVore in which he refused to see DeVore unless his mother was present. Dkt. No. 83-8, pp. 11–12 (Pg. ID 2507–08). This was Plaintiff's only appointment with DeVore in 2014. *Id.*

DeVore wrote three letters to the medical school on Plaintiff's behalf in 2014. *See* Dkt. No. 83-2, pp. 3–5 (Pg. ID 2356–58). In Plaintiff's absence, his mother took a very active role in getting the letters and making suggestions about the letters' content. *See* Dkt. No. 83-8, p. 33 (Pg. ID 2529). DeVore's February 19, 2014 letter recommended that Plaintiff be given "special accommodations for a more flexible schedule for labs, exams, and other course requirements." Dkt. No. 83-2, p. 3 (Pg. ID 2356). In another letter, dated April 14, 2014, DeVore "urge[d] the administration to seriously consider [Plaintiff's grade] appeal" of an exam where two exams appeared on the computer screen, causing Plaintiff to feel anxious and perform poorly on the exam. Dkt. No. 83-2, p. 4 (Pg. ID 2357). DeVore wrote that this poor grade had caused Plaintiff to experience setbacks in his health progress. *Id*. The letters were not submitted to SDS.

## C. Plaintiff's Third Year of Medical School

By August 2014, Plaintiff had passed all his Year 1 classes after two years in the modified curriculum program, so he reentered the traditional Year 2 track with a full course load. Dkt. No. 83-24, p. 2 (Pg. ID 2708).

On November 17, 2014, DeVore wrote a letter to the medical school recommending that Plaintiff "be provided with special accommodations in terms of alternate testing format and extended testing time." Dkt. No. 83-2, p. 5 (Pg. ID 2358). Devore also recommended "a flexible testing schedule due to [Plaintiff's]

lack of ability to focus on his preparation for the upcoming exams as a result of" testing anomalies that caused him to develop a fear of the computer exams. *Id*. After receiving this letter from DeVore, MacLean emailed Plaintiff on November 26, 2014 to remind him that he was required to obtain accommodations through SDS. Dkt. No. 70-22, p. 2 (Pg. ID 1783). MacLean offered Plaintiff a reduced-distraction testing room until he was able to secure accommodations properly through SDS. *Id*.

Plaintiff and his mother went to the SDS on December 12, 2014. Dkt. No. 83-7, p. 5 (Pg. ID 2469). Because Plaintiff had not scheduled an appointment, SDS gave him informal accommodations (extended testing time and a distraction-reduced environment) until his intake appointment. *Id*. Plaintiff completed his intake appointment on January 12, 2015. *Id*. Plaintiff presented a note from DeVore and was issued formal accommodations that same day. *Id*.

### 1. The Car Accident

On December 5, 2014, Plaintiff was in a car accident with his mother. Dkt. No. 83-25, p. 20 (Pg. ID 2729). The car Plaintiff's mother was driving was damaged in a hit-and-run. *Id*. at 20–21. Plaintiff was with his mother as she filed a police report. Dkt. No. 83-26, p. 55 (Pg. ID 2812).

Four days later, on the morning of December 9, 2014, Plaintiff got into a car accident while driving a rental car. *Id*. Plaintiff emailed his professors, Dr.

Christopher Geyer and Dr. Chih Chuang, that he "got into a serious car accident on [his] way to school" and that he would provide them with more information later on that day. Dkt. No. 70-7, p. 3 (Pg. ID 1670). After the accident, Plaintiff drove the rental car to the collision shop, because the damage was "somewhat minor." Dkt. No. 83-26, p. 56 (Pg. ID 2813); Dkt. No. 83-40, p. 2 (Pg. ID 3093). Plaintiff states that he did not call the police because he had anxiety and did not know what to do after a car accident. Dkt. No. 83-26, p. 62 (Pg. ID 2819).

Chuang responded shortly after Plaintiff sent the email, checking if Plaintiff was okay and requesting a copy of the police report prior to rescheduling Plaintiff's required training from that morning. Dkt. No. 70-7, p. 2 (Pg. ID 1669). Plaintiff states that the owner of the collision shop gave him a short accident report form from his mother's accident, and altered this form to report the accident happened on December 9, rather than December 5. Dkt. No. 83-26, p. 57 (Pg. ID 2814). Nine hours after Chuang's email, Plaintiff responded, stating "[p]lease find attached the police report and picture of my car following the accident," and attaching a scan of the altered accident report form and a photo of his mother's damaged car from the December 5th accident.[4] Dkt. No. 70-7, pp. 2–5 (Pg. ID 1669–72).

_____

[4] Plaintiff also directed Connors to review the report and photo he submitted to Chuang when she emailed to see how he was doing after the accident. Dkt. No. 70-45, p. 4 (Pg. ID 1884).

Chuang requested that Plaintiff provide the full police report from the accident because the form Plaintiff submitted was incomplete. Dkt. No. 83-39, p. 5 (Pg. ID 3074). Chuang sought to double-check the information provided, so he passed on the accident report number to other staff, who forwarded it to the police department. *Id.* The police department informed the medical school that the report with that number did not match the information Plaintiff provided. *Id.* at 6. The police instructed Jackson to ask Plaintiff for the full police report. Dkt. No. 70-10, p. 3 (Pg. ID 1681).

Jackson emailed Plaintiff requesting a full copy of the accident report on December 19, 2014. Dkt. No. 83-41, p. 2 (Pg. ID 3095). Jackson requested the documentation by January 7, 2015. Dkt. No. 70-10, p. 3 (Pg. ID 1681). Plaintiff responded that he was sick and studying for exams, so he could not provide the report. Dkt. No. 83-41, p. 2 (Pg. ID 3095). Plaintiff also stated that he told Jackson that he had already provided what he had, since his mother dealt with the insurance. Dkt. No. 83-26, p. 58 (Pg. ID 2815).

On January 12, 2015, Plaintiff submitted a digitally-altered police report to Jackson via email. Dkt. No. 70-10, p. 3 (Pg. ID 1681). Plaintiff had paid a friend cash to alter his mother's Michigan Traffic Crash Report to reflect the information he provided to the school on December 9th. Dkt. No. 83-26, pp. 59–60 (Pg. ID 2816–17). The alterations including changes to the date and time of the accident,

name and driver's license information, and gender of pronouns in the narrative. *Compare* Dkt. No. 70-8 *with* Dkt. No. 70-9. Plaintiff testified that Jackson pressured him to provide a report, which elevated his anxiety, causing him to make the decision to submit the falsified report. Dkt. No. 70-44, p. 6 (Pg. ID 1874).

When the medical school learned that Plaintiff submitted a falsified police report, Jackson submitted a Student Code of Conduct Report to the Dean of Students on main campus at Wayne State University. Dkt. No. 83-13, p. 19 (Pg. ID 2615). On February 6, 2015, Plaintiff was found responsible for "knowingly furnishing false information to the institution" and "failure to comply with the direction of any authorized institutional representative, acting in the performance of his/her duties." Dkt. No. 70-11, pp. 2–3 (Pg ID 1684–85).

### 2. Plaintiff's Final Semester at the Medical School

Plaintiff completed the course exams for his Immunology/Microbiology course, which ended in September 10, 2014, on January 8, 2015. Dkt. No. 70-30, p. 2 (Pg. ID 1807). Plaintiff's final score was a 66.47%, below the pass rate set for the course. *Id*. Plaintiff later appealed his Immunology/Microbiology grade because he believed the professor miscalculated his score. Dkt. No. 83-24, p. 3 (Pg. ID 2709); Dkt. No. 83-23, p. 2 (Pg. ID 2706).

On January 14, 2015, Plaintiff was placed on academic probation due to course failure. Dkt. No. 70-29, p. 2 (Pg. ID 1804). Several days later, he submitted

doctors' notes granting him a combined thirteen days of excused absences in relation to a "life threatening car accident." *See* Dkt. No. 70-34, p. 2 (Pg. ID 1823); Dkt. No. 70-17, pp. 7, 17 (Pg. ID 1729, 1739).

On January 19, 2015, Plaintiff attended an appointment with DeVore, where he spoke about his lapse in judgment for providing the falsified police report. Dkt. No. 83-8, p. 22 (Pg. ID 2518). Plaintiff provided the school with an unsigned letter from DeVore the next day, stating that his anxiety and obsessions can cause reactions to be impulsive and based on fear, leading to poor decision making. Dkt. No. 70-13, p. 2 (Pg. ID 1695).

On February 5, 2015, Plaintiff filed a complaint with the Wayne State University Office of Equal Opportunity against Jackson. Dkt. No. 83-11, p. 2 (Pg. ID 2586). Plaintiff alleged that Jackson discriminated against him based on disability and national origin, because Jackson allowed multiple exams to pop up on Plaintiff's computer screen; demanded to meet with Plaintiff, causing him embarrassment in front of his classmates and lost study time; and denied Plaintiff's request to be called by a nickname instead of his birth name. Dkt. No. 83-11, pp. 4–5 (Pg. ID 2588–89).

In March 2015, Plaintiff and his mother drafted a letter for DeVore to provide the school, including all the accommodations that Plaintiff sought. Dkt. No. 70-48, pp. 5–9 (Pg. ID 1898–1902). DeVore modified, signed, and sent the

letter. *Id*. The letter stated that Plaintiff needed a customized testing schedule, an undisturbed testing environment, and no emails sent to him within an unspecified period prior to exams. *Id*.

On March 27, 2015, a meeting was held between Plaintiff, Plaintiff's father, DeVore, a representative from SDS, and Dr. Patrick Bridge, the Associate Dean of Undergraduate Medical Education. Dkt. No. 70-18, p. 32 (Pg. ID 1773). In the meeting, the group created a customized testing schedule that Plaintiff agreed to adhere to with no additional absences. *Id*.; Dkt. No. 83-7, p. 21 (Pg. ID 2485); Dkt. No. 83-8, p. 25 (Pg. ID 2521).

On April 2, 2015, Plaintiff emailed and requested two new accommodations: to take exams in a room by himself and to take exams later in the day. Dkt. No. 70-26, p. 3 (Pg. ID 1795). The next day, Plaintiff requested another two new accommodations: to choose the room he takes his exams in and that Dr. Jason Booza, Director of Assessment and Medical Research, not be allowed to communicate with him before or during the day of his exam. *Id*. at 2. He did not contact the SDS about these accommodations and did not provide medical documentation at the time. Plaintiff emailed DeVore later that month asking for a letter to state his need for afternoon exams. Dkt. No. 83-8, p. 43 (Pg. ID 2539).

On May 5, 2015, after missing additional make-up exams, Plaintiff created another custom testing schedule. Dkt. No. 70-50, p. 5 (Pg. ID 1909). Nevertheless,

Plaintiff continued to miss exams on his customized schedule. Dkt. No. 70-48, p. 4 (Pg. ID 1897). On May 12, 2015, Plaintiff filed a complaint against Wayne State University with the Michigan Department of Civil Rights, alleging discrimination based on national origin and disability. Dkt. No. 83-11, p. 6 (Pg. ID 2590). On May 29, 2015, Plaintiff emailed the school to requesting a specific proctor to administer his exam and noting how two exams popped up on the screen during a prior exam, which exacerbated his anxiety. Dkt. No. 70-48, p. 4 (Pg. ID 1897).

At the end of May 2015, Plaintiff's Immunology grade appeal was denied at the final step of the appellate process. Dkt. No. 83-24, p. 2 (Pg. ID 2708). Plaintiff and his mother had an appointment with a nurse on June 9, 2015, where they expressed anger about the denial of his grade appeal, and an increase in Plaintiff's depressive symptoms. Dkt. No. 70-46, p. 3 (Pg. ID 1887).

### 3. Promotions Committee Hearing

On June 12, 2015, Plaintiff received a letter that he was being called before the Promotions Committee to review his academic performance and progress. Dkt. No. 70-31, p. 2 (Pg. ID 1809). The letter stated that, "[t]he committee has the authority to decide all possible outcomes including dismissal." *Id*.

Plaintiff submitted a letter for the Committee's consideration, detailing "the tortuous ride that has been [his] second year of medical school." Dkt. No. 70-34. He spoke extensively about his anxiety, his grade appeal, and his plan to take

missing exams over the summer and appeal other failed exams. *Id.* at 2–4. DeVore wrote a letter on Plaintiff's behalf on July 9, 2015. Dkt. No. 83-8, p. 46 (Pg. ID 2542). He stated in the letter that Plaintiff had been compliant in treatment, but later testified that the assessment was not accurate. *Id.* at 46–47, 58.

On July 10, 2015, Plaintiff attended the meeting, along with his father and his attorney. Dkt. No. 83-26, p. 21 (Pg. ID 2778). Plaintiff secretly recorded the hearing, including conversations between the committee members and the university's attorney after he had left the room. *Id.* at 22; Dkt. No. 70-36, p. 3 (Pg. ID 1828). Plaintiff did not receive a copy of the packet assembled summarizing his time at the medical school, Dkt. No. 83-24, and he disputes the accuracy of the information within the packet. Dkt. No. 83-26, p. 67 (Pg. ID 2824). After Plaintiff's presentation, the Promotions Committee voted to dismiss Plaintiff. Dkt. No. 70-36, p. 3 (Pg. ID 1832). The Committee was not aware that Plaintiff had paid someone else to alter the police report at the time of the decision. Dkt. No. 70-35, p. 3 (Pg. ID 1828).

Dr. Maryjean Schenk, the Vice Dean of Medical Education, sent Plaintiff a letter on July 10, 2015, notifying him of his dismissal and informing him of the need to appeal within ten days. Dkt. No. 70-37, p. 2 (Pg. ID 1834). That same day, Plaintiff amended his complaint with the Michigan Department of Civil Rights, alleging retaliation in addition to disability and national origin discrimination. Dkt.

No. 83-11, p. 7 (Pg. ID 2591). Plaintiff appealed his dismissal on July 29, 2015, with the assistance of his attorney. Dkt. No. 70-38; Dkt. No. 70-44, p. 12 (Pg. ID 1880). His appeal was denied. Dkt. No. 70-39, p. 2 (Pg. ID 1844). Plaintiff appealed this denial to the Dean of the Graduate School, the final step in the appeal process. *See* Dkt. No. 70-40. His final appeal was denied on September 18, 2015. *Id.*

### D. Plaintiff's Medical Documentation and Illnesses

Between September 2012 and July 2015, Plaintiff submitted dozens of doctors' notes from multiple physicians, hospitals, therapists, and urgent care centers, providing over 100 days of excused absences. *See* Dkt. Nos. 70-16, 70-17. The notes listed a diverse array of diagnoses, ranging from tonsillitis to a urinary tract infection. *See id.*

The largest number of Plaintiff's excused absences came from Dr. Elie Khoury, Plaintiff's mother's gynecologist. Dkt. No. 70-15, p. 5 (Pg. ID 1702). According to Khoury, Plaintiff's mother would come in, verbally describe Plaintiff's conditions, and Khoury would write out a diagnosis on a disability certificate. *Id.* at 6. Plaintiff's mother would then write in the number of days that Plaintiff wanted excused from school. *Id.* at 7. Plaintiff submitted thirteen notes from Khoury, who saw Plaintiff three times. *Id.* at 8. Khoury stated, "I don't take care of men," and never treated Plaintiff as a patient. *Id.* at 5. Khoury testified that

he stopped providing Plaintiff's mother with excused absence notes on September 2, 2014.[5] *Id.* at 10–11 ("I told her this is not proper anymore to give note, you know, disability notice for I don't see him, and I'm not going to give it to him anymore, because I notice so many times he took this").

Plaintiff states his first diagnosis of anxiety was in November 2012, from Dr. Basel Brikho. Dkt. No. 70-17, p. 4 (Pg. ID 1726) (noting Plaintiff had "acute gastroenteritis" and "anxiety and stress"). A week later, he made an emergency appointment with psychiatrist Dr. Al-Najjar, who noted that Plaintiff had a "deteriorate[ed] mood" and "severe anxiety associated with psychosomatic disturbance involving his Gastro-enteric functions." Dkt. No. 70-21.

In May 2013, Plaintiff began seeing DeVore for his anxiety. Dkt. No. 83-8, p. 11 (Pg. ID 2507). DeVore referred Plaintiff to a psychiatrist, Dr. Espiritu, in June 2013. *Id.* at 14. Notes describe Plaintiff as having severe depression and moderate severe anxiety. Dkt. No. 70-46, p. 3 (Pg. ID 1887); Dkt. No. 83-2, p. 5 (Pg. ID 2358). His anxiety caused him chest pain, and led to him passing out on at least one occasion. Dkt. No. 70-46, p. 2 (Pg. ID 1886). Plaintiff did not take the

---

[5] There is a dispute of fact as to the authenticity of some of Plaintiff's medical notes, *see, e.g.*, Dkt. Nos. 83-13, 83-14 (two versions of the same letter from DeVore, in which the unsigned version includes additional language omitted from the signed version); Dkt. No. 82-16 (DeVore provides Plaintiff's mother with his blank letterhead upon which to place content); Dkt. No. 70-16, pp. 10–14 (Pg. ID 1718–22) (five notes from Dr. Khoury dated after Khoury testified he stopped providing them), but this issue is not material to the current motions.

medication his psychiatrists prescribed him because of weight gain. Dkt. No. 83-8, pp. 25–26 (Pg. ID 2521–22); Dkt. No. 83-26, p. 14 (Pg. ID 2771).

DeVore counseled Plaintiff on the importance of his compliance, but DeVore notes Plaintiff had difficulty assuming responsibility for his role in the issues that were occurring in his academic program. Dkt. No. 70-46, p. 2 (Pg. ID 1886). Although DeVore repeatedly sought to get Plaintiff to schedule regular appointments, Plaintiff would only come in for emergency appointments during crises. *Id*.

When stressed, Plaintiff's anxiety caused him to act impulsively and exercise poor judgment. Dkt. No. 70-13, p. 2 (Pg. ID 1695); Dkt. No. 83-8, p. 51 (Pg. ID 2547). Plaintiff surreptitiously made audio recordings of conversations with others during his time at the medical school, which DeVore discouraged. Dkt. No. 83-8, p. 13 (Pg. ID 2509).

### E. Subsequent Developments

After his dismissal, Plaintiff enrolled at an unaccredited Belizean medical school. Dkt. No. 83-26, p. 6 (Pg. ID 2763). He was able to move straight into clinical rotations without having to take additional classes. *Id*. at 6–8. Plaintiff passed several computerized exams to test out of the classes he failed at Wayne State University School of Medicine. *Id*. at 10 (Pg. ID 2767). He did not request any disability accommodations. *Id*.

On September 8, 2016, DeVore wrote a letter seeking accommodations for Plaintiff during the Medical Licensing Examination. Dkt. No. 70-51, pp. 2–3 (Pg. ID 1911–12). That letter states that Plaintiff has obsessive-compulsive disorder and depression. *Id*. The only accommodation requested for the licensing exam was extended testing time. *Id*. DeVore had not seen Plaintiff for seven months at the time he wrote the letter. Dkt. No. 83-8, p. 7 (Pg. ID 2503).

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) "directs that summary judgment shall be granted if 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). The Court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, the Court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

# IV. DISCUSSION

This case involves five remaining claims against seven defendants for violations of Plaintiff's Constitutional rights, the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et. seq.*, the Americans with Disabilities Act (ADA), 42 U.S.C. §12101, *et. seq.*, and a claim of Intentional Infliction of Mental and Emotional Distress (IIED). Dkt. No. 36, pp. 38–45 (Pg. ID 710–17).

## A. Defendant's Motion for Summary Judgment

In their Motion for Summary Judgment, Defendants seek the dismissal of all of Plaintiff's remaining claims. Dkt. No. 70, p. 20 (Pg. ID 1610).

### 1. Section 1983 Claims Against Individual Defendants in Their Individual Capacities

Defendants first argue that Plaintiff has failed to pled an individual capacity claim under § 1983 with the legally required specificity. Dkt. No. 70, p. 29 (Pg. ID 1619). Accordingly, they assert that Plaintiff only brought Counts I and II against individual Defendants in their official capacities. *Id.* Plaintiff argues that his demand for damages was sufficient to state individual capacity claims, and that his mention of "individual Defendants" put them on notice of an individual capacity claim. Dkt. No. 83, pp. 18–19 (Pg. ID 2326–27).[6]

---

[6] If the Court finds that individual capacity claims were improperly pled, Plaintiff seeks permission to amend his complaint for a third time. Dkt. No. 83, pp. 18–19 (Pg. ID 2326–27)

The Sixth Circuit requires § 1983 plaintiffs to "set forth clearly in their pleading that they are suing the state defendants in their individual capacity for damages, not simply their capacity as state officials." *Shepherd v. Wellman*, 313 F.3d 963, 967 (6th Cir. 2002) (quoting *Wells v. Brown*, 891 F.2d 591, 593 (6th Cir. 1989)). In the absence of an explicit statement, courts are to utilize a "course of proceedings" test to determine whether the § 1983 defendants received notice of the plaintiff's intent to hold them personally liable. *Id*. at 967–68. This test considers (1) the nature of the plaintiff's claims, (2) requests for compensatory or punitive damages, and (3) the nature of any defenses raised in response to the complaint, particularly claims for qualified immunity, to determine whether defendants had actual knowledge of the potential for individual liability. *Id*. at 968.

Here, Plaintiff failed to mention individual capacity claims explicitly in any of his three complaints. The most recent complaint addresses individual Defendants as officials, stating their titles and specifying that they functioned as public employees of the university. Dkt. No. 36, pp. 1, 38 (Pg. ID 673, 710). Nevertheless, the complaint requests punitive damages against the individual Defendants. *Id*. at 46. While a request for monetary damages, by itself, is insufficient to put a state official on notice of an individual capacity claim, *Shepherd*, 313 F.3d at 969, Defendants asserted the defense of qualified immunity against Plaintiff's § 1983 claims in their answer. Dkt. No. 37, p. 36 (Pg. ID 756).

Thus, although Plaintiff's complaints failed to plead individual capacity claims properly, it appears that individual Defendants received some notice of Plaintiff's intent to hold them personally liable. The Court declines to dismiss individual capacity claims on this basis.

### a. Claims Against Defendant Kathleen Connors

Next, Defendants assert that Connors, in her role as a student counselor at the medical school, does not qualify as a state official. Dkt. No. 70, p. 30 (Pg. ID 1620). Plaintiff argues that Connor's failure to refer Plaintiff to the Student Disability Services (SDS) in December 2012 constituted decisions made on behalf of the school as a state official. Dkt. No. 83, p. 19 (Pg. ID 2327).

To state a claim under § 1983, a plaintiff must allege that his or her constitutional rights were violated by someone acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). The Supreme Court stated in *West* that "[s]tate employment is generally sufficient to render the defendant a state actor." *Id*. at 49 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 n.18 (1982)). In order for a defendant's conduct to be "under color of state law," the defendant must exercise power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326 (1941).

Defendants do not dispute that Wayne State University is a public university, and Kathleen Connors is employed there as a counselor. Dkt. No. 37, pp. 3–4 (Pg. ID 723–24). Further, Connors engaged in the alleged conduct while exercising her responsibilities as a public employee, rather than as a private individual. Accordingly, Connors can be considered a state actor. The Court will not dismiss claims against her on this basis.

### 2. Count I: First Amendment Claim

In Count I, Plaintiff alleges Wayne State University and individual Defendants, functioning as public employees of the institution, retaliated against him for protected free speech activity. Dkt. No. 36, p. 38 (Pg. ID 710). His complaint does not specify the protected speech.[7] Plaintiff now appears to claim that his requests for accommodations and his complaints to the University's Office of Equal Opportunity and Michigan Department of Civil Rights was protected conduct. Dkt. No. 83, p. 22 (Pg. ID 2330). Defendants assert that there is no evidence that members of the Promotions Committee were aware of Plaintiff's discrimination complaints at the time they voted to dismiss him. Dkt. No. 70, p. 32 (Pg. ID 1622).

---

[7] Plaintiff's complaints regarding grading do not constitute protected speech. *Stephenson v. Central Michigan University*, 897 F. Supp. 2d 556, 566 (E.D. Mich. 2012).

A First Amendment retaliation claim requires the following: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Assuming that Plaintiff's complaints to the University's Office of Equal Opportunity and Michigan Department of Civil Rights constituted protected conduct,[8] and that his dismissal constitutes an adverse action, Plaintiff has not produced evidence that establishes a causal connection between his dismissal and protected speech.

Plaintiff filed a complaint of discrimination against Jackson with the Office of Equal Opportunity on February 5, 2015, after he was charged with misconduct for submitting a falsified police report the previous month. Plaintiff alleges that Bridge's March 13 email constitutes evidence of a conspiracy in reaction to

---

[8] Members of the Promotions Committee mentioned considering the notes from Plaintiff's mother's gynecologist, who testified that Plaintiff was not a patient because he did not treat men. Dkt. No. 70-15, p. 5 (Pg. ID 1702); Dkt. No. 70-43, p. 3 (Pg. ID 1860); Dkt. No. 70-43, p. 7 (Pg. ID 1864). Plaintiff has not provided case law that supports the argument that submission of doctor's notes from a doctor that was not treating him constitutes a form of protected speech. None of the members of the Promotion's Committee testified that Plaintiff's other requests for accommodation from treating providers DeVore or Dr. Al-Najjar were a motivating factor in voting to dismiss Plaintiff.

Plaintiff's complaint. However, Bridge's email did not result in any adverse action. Although Bridge's email stated Plaintiff would not be granted any more excused absence, the school continued to defer and reschedule Plaintiff's exams for absences both excused and unexcused. *See, e.g.*, Dkt. No. 70-18, p. 32 (Pg. ID 1773) (allowing Plaintiff to reschedule his April 28, 2015 endocrine exam after he overslept); Dkt. No. 70-48, p. 4 (Pg. ID 1897) (allowing Plaintiff to reschedule the make-up renal exam he scheduled for May 19, 2015 after he provided notes from his therapist and an urgent care center).

Plaintiff then argues that Jackson created a packet with false information and unsubstantiated accusations to be provided before the Promotions Committee. Dkt. No. 83, pp. 24–25 (Pg. ID 2332–33). The record, however, indicates otherwise. *See* Dkt. No. 83-13, p. 29 (Pg. ID 2625) ("Q: Did—did you create this document? A: No. I did not create this"). The professionalism charges included in the packet were not new allegations. Rather, packet included charges for which other committees had previously found Plaintiff responsible. Plaintiff presented the Professionalism Committee with his explanation about the cadaver incident and the shared log-in allegations in November 2012, and the Committee determined that he had failed to meet community standards. Dkt. No. 70-6, p. 2 (Pg. ID 1666). Similarly, the Code of Conduct investigation in January 2015 found that Plaintiff was responsible for knowingly furnishing false information. Dkt. No. 70-5, p. 14 (Pg. ID 1664). The

statement that Plaintiff had an "excessive number of exam absences" was also reviewed by the Professionalism Committee, Dkt. No. 70-5, p. 11 (Pg. ID 1661), and the packet noted that some of these absences were excused by physicians' notes. Dkt. 83-24, p. 2 (Pg. ID 2708).

More importantly, the individuals who did vote to dismiss Plaintiff—which did not include any of the individual Defendants—testified that his civil rights complaints played no role in their decision. Dkt. No. 70-43. Dr. Eileen Hug testified that she did not know Plaintiff had filed a discrimination complaint against Jackson, *id*. at 5, and that his anxiety disorder played no role in her decision, *id*. at 3. Rather, Hug based her decision on Plaintiff's documented professionalism issues and his lack of academic success. *Id*. at 3.

Dr. Basim Dubaybo voted to dismiss Plaintiff because he had submitted a falsified police report, had a pattern of late exams, and because Dubaybo did not believe Plaintiff was being honest about the excused absences from his mother's gynecologist. *Id*. at 7. He also was unaware that Plaintiff filed a discrimination complaint against Jackson at the time of the hearing. *Id*. at 8.

Dr. Mary Lu Angelilli voted to dismiss Plaintiff because of his numerous excused absences to exams set up specifically for him, the falsified police report, and the lack of evidence that the existing problems would be solved in the future. *Id*. at 10–11. Angelilli missed part of Plaintiff's statement, but described it as

"lengthy" and felt she had enough information to vote. Dkt. No. 83-27, pp. 5–6 (2867–68). The fact that Plaintiff was receiving disability accommodations made no impact on her decision. *Id*. at 6. She does not recall seeing DeVore's letter, but states it would not necessarily have changed her vote. *Id*. at 7.

The evidence submitted establishes that when the Promotions Committee voted to dismiss Plaintiff from medical school, this decision was not motivated by any of Plaintiff's protected speech. Rather, testimony from the voting committee members establishes that they decided based on the combination of Plaintiff's lack of academic success, his failure to complete courses in a timely manner, and his professionalism issues, including submission of a falsified police report to substantiate an absence. These reasons form a basis for Plaintiff's dismissal that is non-discriminatory and non-retaliatory. Plaintiff has not provided evidence that these undisputed facts are pretextual.

Thus, based on the evidence submitted, a reasonable jury could not find that Defendants dismissed Plaintiff in retaliation for protected speech. The Court grants Defendants summary judgment on Plaintiff's First Amendment claim.

### 3. Count II: Due Process Claim

In Count II, Plaintiff alleges that "[t]he actions of Defendants, and each of them, carrying out the policies and practices of Defendant University and School of Medicine," his due process rights. Dkt. No. 36, p. 39 (Pg. ID 711). Plaintiff

believes he deserved more procedural protections because his dismissal was based on conduct violations, rather than just academic performance. Dkt. No. 83, p. 27 (Pg. ID 2335).

The Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Generally, a due process claim requires a two-part analysis: "whether [the plaintiff] was deprived of a protected interest, and, if so, what process was . . . due." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

The Supreme Court has previously accepted that continued enrollment in a public educational institution may be a constitutionally protected right, subject to due process protections. *Regents of U. Mich. v. Ewing*, 474 U.S. 214, 222–23 (1985). For the purposes of this motion, the Court will assume that Plaintiff's continued enrollment in medical school is a recognized liberty or property interest. Dismissal from medical school would be a deprivation of that interest. Thus, the only factor left to consider is what process Defendants owed Plaintiff.

### a. Procedural Due Process

"Procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest." *Warren v. Athens*, 411 F.3d 697, 708 (6th Cir. 2005). "The very nature of due process negates any concept of inflexible procedures

universally applicable to every imaginable situation." *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961).

In academic dismissals, a court "should show great respect for the faculty's professional judgment" and "may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225. "Where dismissals are considered academic in nature, procedural due process does not require a hearing before a decisionmaking body either before or after the termination decision is made." *Fuller v. Schoolcraft Coll.*, 909 F. Supp. 2d 862, 876 (E.D. Mich. 2012) (requiring only that the student is informed of the nature of the dissatisfaction and the final decision is "careful and deliberate").

Meanwhile, "[d]isciplinary dismissals, being more objective in nature and not dependent upon the analytical expertise of professional academicians," require higher standards of protection. *See Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005). "The hearing, whether formal, informal, live or not, must be meaningful and must provide the accused with the opportunity to 'respond, explain, and defend.' " *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005). At a disciplinary hearing, the student has a right to be present for all significant portions of the hearing, but the university need not allow active representation by legal counsel.

*Id.* at 635–36. "Finally, due process generally does not require an appeal from a school's decision that was reached through constitutional procedures." *Id.* at 636.

In the Sixth Circuit, dismissing a medical student for lack of professionalism is academic evaluation. *Al-Dabagh v. Case W. Reserve Univ.*, 777 F.3d 355, 360 (6th Cir.), *cert. denied*, 135 S. Ct. 2817 (2015) (emphasizing that "academic evaluations" may permissibly extend beyond raw grades and other objective criteria). *See also Keefe v. Adams*, 840 F.3d 523, 530 (8th Cir. 2016), *cert. denied*, No. 16-1035, 2017 WL 843965 (U.S. Apr. 3, 2017) ("Many courts have upheld enforcement of academic requirements of professionalism and fitness, particularly for a program training licensed medical professionals.").

In *Al–Dabagh*, the Sixth Circuit found that dismissal of academically successful medical student based on multiple allegations of unprofessional conduct amounted to a deference-receiving academic dismissal. 777 F.3d at 359. Much like here, the plaintiff claimed that the committee faulted him for things that did not happen and disregarded his explanations for the things that did. *Id.* at 361. The Sixth Circuit stated that overturning the committee's decision would be akin to "decid[ing] for ourselves whether he behaved in a sufficiently professional way to merit a degree," which "goes beyond our job description." *Id. See also Zimmeck v. Marshall Univ. Bd. of Governors*, 632 F. App'x 117, 119 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 2021 (2016) (finding a medical student's procedural due process

rights were not violated when she was dismissed for academic reasons after being notified of a hearing and participating in the appeals process).

Here, testimony of committee members establishes that Defendants dismissed Plaintiff based on both academic and professionalism grounds, which qualifies it as an academic dismissal. The procedural protections Plaintiff received exceeded those required for an academic dismissal. Plaintiff received warnings about his failure to take make-up exams promptly and recommendations to seek regular medical care from a specialist to avoid continued absences. Dkt. No. 70-18, pp. 16, 31 (Pg. ID 1757, 1772). He similarly received several hearings during his time at the medical school regarding the multiple allegations of unprofessional conduct. Dkt. No. 70-6, pp. 2–3 (Pg. ID 1666–67); Dkt. No. 70-11, p. 2 (Pg. ID 1684). Both of those hearings concluded that Plaintiff failed to meet school professionalism standards, which include honesty and personal responsibility. *See* Dkt. No. 83-28, p. 74 (Pg. ID 2947).

Plaintiff received advance notice of his dismissal hearing, which stated that the committee "has the authority to decide all possible outcomes including dismissal." Dkt. No. 70-31, p. 2 (Pg. ID 1809). He was able to submit a letter regarding his points, including his disability, and presented at the hearing, accompanied by his father and an attorney. Dkt. No. 70-34; Dkt. No. 83-5, p. 23 (Pg. ID 2450); Dkt. No. 83-26, p. 21 (Pg. ID 2778). After the committee voted to

dismiss, Plaintiff was granted multiple levels of appeal—which the law does not require—that affirmed the committee's decision. Dkt. No. 70-37, p. 2 (Pg. ID 1834); Dkt. No. 70-39, p. 2 (Pg. ID 1844); Dkt. 70-40. Moreover, an attorney assisted Plaintiff in writing his appeal letter. Dkt. No. 70-38; Dkt. No. 83-8, p. 48 (Pg. ID 2544).

In sum, the evidence provided illustrates that Defendants provided Plaintiff with sufficient notice and opportunity to voice his concerns throughout the dismissal process. The Court grants summary judgment as to Plaintiff's procedural due process claim.

### b. Substantive Due Process

As for substantive due process, the Supreme Court has "assumed, without deciding, that federal courts can review an academic decision of a public educational institution under a substantive due process standard." *Ewing*, 474 U.S. at 222 (citing *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 91–92 (1978)). In *Horowitz*, the Court stated that lower courts implied in dicta that academic dismissals from state institutions can be enjoined if "shown to be clearly arbitrary or capricious," but noted, "[c]ourts are particularly ill-equipped to evaluate academic performance." 435 U.S. at 92 (warning against judicial intrusion into academic decision-making).

A court may only override a school's academic decision if "it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225. The Supreme Court directs courts to defer to "the faculty's professional judgment." *Id*. There is "no violation of substantive due process unless misconduct of government officials that violates a fundamental right is 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience' of federal judges." *Keefe*, 840 F.3d at 533 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

Plaintiff failed exams after receiving accommodations in December 2014, repeatedly missed make-up exams scheduled specifically for him, failed to take exams in a timely fashion, and submitted a forged police report to the school to substantiate an absence. Committee members cited these reasons for deciding to dismiss Plaintiff from medical school. The Court does not find these reasons to be arbitrary or capricious, and thus does not find that Plaintiff has demonstrated an issue of material fact with respect to a substantive due process claim. The Court grants summary judgment with regard to any substantive due process claim Plaintiff has alleged.

**4. Individual Defendants Are Entitled to Qualified Immunity**

Six individual Defendants remain in the present case: Jackson, Schenk, Connors, MacLean, Booza, and Bridge. Five of the six individual Defendants were not members of the Promotions Committee that voted to dismiss Plaintiff. Dkt. No. 70, p. 30 (Pg. ID 1620). Schenk was the Chair of the Committee, but did not vote on Plaintiff's dismissal. *Id*. at 30–31.

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014). First, courts examine whether facts, taken in the light most favorable to the party asserting the injury, show the state actor's conduct violated a federal right. *Id*. (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, courts must ask whether the right in question was "clearly established" at the time of the violation. *Id*. at 1866 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The Supreme Court has stated that, "the clearly established law must be 'particularized' to the facts of the case," because "[o]therwise, 'plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.' " *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal citations and alterations omitted). "Courts have discretion to decide the order in which to engage these two prongs." *Id*. (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Even if Plaintiff had established that Defendants violated his federal rights, Defendants would be entitled to qualified immunity. Plaintiff bore the burden of demonstrating that the law was clearly established at the time of Defendants' challenged conduct. *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 544 (6th Cir. 2013). His arguments as to why qualified immunity does not apply fail to cite any law that is particularized to the facts of his case.

Plaintiff first asserts that individual Defendants are not entitled to qualified immunity because "they took actions against Yaldo that clearly violate the law." Dkt. No. 83, p. 20 (Pg. ID 2328). First, Plaintiff claims that use of the word "stalking" in an email chain constitutes proof of unlawful behavior by Jackson, such that qualified immunity must be denied. *Id.* at 20–21. A reasonable juror, possessing a modicum of common sense, could not find that Jackson intended to criminally stalk Plaintiff when these emails are read as a whole, in context and in conjunction with deposition testimony.[9] *See* Dkt. No. 83-10, pp. 2–3 (Pg. ID 2582–83).

---

[9] Plaintiff's allegation that Jackson engaged in criminal stalking relies on a woefully misleading omission of material facts and circumstances. *See* Dkt. No. 83-10, pp. 2–3 (Pg. ID 2582–83) (discussing Plaintiff's failure to respond to emails and needing to speak to him in person about checking his email and scheduling make-up exams); Dkt. No. 83-5, p. 22 (Pg. ID 2449) ("[I]t says I made a note to stalk him. I will ask his lab instructor to send him my way. Is that what you understand Doctor Jackson to mean in that email about stalking him? A: Yes. That he would tell the lab instructor to have him come to his office after lab.").

Second, Plaintiff asserts that Jackson's suggestion in an email that Plaintiff be given until the first Wednesday in January, instead of Friday, to make up exams constitutes "clear discriminatory animus." Dkt. No. 83, pp. 20–21 (Pg. ID 2328–29). The policy regarding completion of courses states:

> It is expected that courses will be completed in a timely manner. If a student misses the opportunity to makeup an exam at the regularly scheduled makeup date, a customized exam schedule will be developed. For example, students with missing examinations from the beginning of the academic year through December must complete all missing exams by the end of the first week of January in order to continue with coursework.

Dkt. No. 83-28, pp. 42–43 (Pg. ID 2915–16). Review of the facts submitted illustrates that Plaintiff was given until that Friday to complete his exams after he submitted notes from his mother's gynecologist for three days of excused absences for an upper respiratory infection and urinary tract infection. Dkt. No. 70-16, pp. 13–14 (Pg. ID 1721–22). Plaintiff took his immunology exam—originally scheduled for August 22, 2014—on Thursday, January 8, 2015, and his final NBME exam—originally scheduled for September 9, 2014—on Friday, January 9, 2015. Dkt. No. 70-30, p. 2 (Pg. ID 1807). Based on the facts, Defendants complied with the school policy and allowed Plaintiff to complete his exams by the end of the first week of January.

With regard to Plaintiff's federal claims, he failed to show school administrators of reasonable competence could not disagree about the lawfulness

of the alleged actions, and thus Defendants are entitled to immunity. *See Yoder*, 526 F. App'x at 544–45 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Plaintiff has not presented case law demonstrating that it was objectively unreasonable for a committee made up of non-defendants to vote for his dismissal for academic failures and professionalism violations, even if Defendants had discriminated against him for submitting civil rights complaints and doctor's notes for absences.

Similarly, Plaintiff has not presented case law showing that Defendants were objectively unreasonable in concluding that the processes used in Plaintiff's dismissal afforded him adequate due process. Plaintiff was informed on numerous occasions of faculty dissatisfaction with his performance—such as the Professionalism Committee hearing, his Code of Conduct violation, the email notifying him of his placement on academic probation, and the Promotions Committee notification and hearing—and he has not presented evidence that the Promotions Committee's decision to dismiss him was not "careful and deliberate." *See Yoder*, 526 F. App'x at 550 (citing *Horowitz*, 435 U.S. at 85). Under the circumstances, it was not objectively unreasonable for Defendants to have believed that they provided Plaintiff with adequate due process procedures for an academic dismissal, and accordingly they are entitled to qualified immunity.

### 5. Count III: Intentional Infliction of Emotional Distress (IIED)

In Count IV, Plaintiff alleges that individual Defendants acted with the intent to inflict emotional distress on him. Dkt. No. 36, p. 39 (Pg. ID 711).

In Michigan, a plaintiff alleging IIED must prove four elements: (1) the defendant's "extreme and outrageous" conduct; (2) the defendant's intent or recklessness; (3) causation; and (4) the plaintiff's severe emotional distress. *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602, 374 N.W.2d 905, 908 (1985). "Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Doe v. Mills*, 212 Mich. App. 73, 91, 536 N.W.2d 824 (1995). Accordingly, "[l]iability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.*

Plaintiff alleges that Defendants' acts in refusing to give Plaintiff paper exams, emailing Plaintiff prior to exams, and offering Plaintiff a reduced course load constitutes IIED because Defendants knew or should have known these acts exacerbated Plaintiff's anxiety. Dkt. No. 83, p. 30 (Pg. ID 2338). Without citing to any legal support, Plaintiff also argues that, "the bar for [Defendants'] conduct to be considered extreme and outrageous is lower" because "school administrators

and engaged in a course of discriminatory and retaliatory conduct rather than a single incident." *Id.* at 31.

The Court finds that Defendants' conduct cannot reasonably be regarded as so extreme and outrageous as to amount to IIED. Having an individual take exams on a computer rather than on paper and being sent an email before an exam, while distressing to Plaintiff, do not rise to the level of "extreme or outrageous." Additionally, even if Plaintiff had been "forced" into a modified curriculum, reducing the frequency of a medical student's exams similarly fails to qualify as "extreme or outrageous." *See* Dkt. No. 70-19, p. 2 (Pg. ID 1775); Dkt. No. 83-26, pp. 38–39 (Pg. ID 2795–96).

Although Plaintiff disagrees with the school's decision to dismiss him, none of Defendants' actions has the hallmark of unbearable outrageousness, such that a civilized community would find them atrocious and utterly intolerable. A reasonable juror could not find that this conduct rises to the level of being so extreme that no reasonable person could be expected to endure it. Therefore, the Court grants summary judgment on Plaintiff's IIED claim.

## B. Claims Upon Which Both Parties Seek Summary Judgment

Plaintiff alleged two claims related to his disability of anxiety. In Count VII, Plaintiff alleges that Wayne State University violated the Rehabilitation Act by denying him reasonable accommodations and denying his appeals. Dkt. No. 36, pp.

40–43 (Pg. ID 712–15). In Count VIII, Plaintiff alleges that Wayne State University violated the ADA by failing to provide him reasonable accommodations to address his disability of anxiety. Dkt. No. 36, pp. 43–45 (Pg. ID 715–17). Both parties seek summary judgment on Plaintiff's disability claims.

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id*. at § 12132. A qualified individual with a disability is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for . . . participation in programs or activities provided by a public entity." *Id*. at § 12131(2). A public entity includes a state or local government body or any instrumentality thereof. *Id*. at § 12131(1).

Section 504 of the Rehabilitation Act provides, in pertinent part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794(a).

The Rehabilitation Act, which was enacted prior to the ADA, applies only to programs receiving federal financial support. *Id.*

Both the ADA and the Rehabilitation Act prohibit discrimination against qualified disabled individuals by requiring those individuals receive "reasonable accommodations" to enable participation in programs or activities of a public entity. *See Doe v. Woodford Cty. Bd. of Educ.*, 213 F.3d 921, 925 (6th Cir. 2000). The ADA defines "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on" its operations. 42 U.S.C. § 12112(b)(5)(A). Under the Rehabilitation Act "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers . . . [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

In the context of an educational environment, the ADA and the Rehabilitation Act require a covered school to offer reasonable accommodations for a student's known disability unless the accommodation would require "an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." *Kaltenberger v. Ohio Coll. of Podiatric*

*Med.*, 162 F.3d 432, 436 (6th Cir. 1998) (quoting *Southeastern Community College v. Davis*, 442 U.S. 397, 413 (1979)). Additionally, an accommodation may be found to be unreasonable where a school establishes that the proposed modification will cause "undue hardship in the particular circumstances." *Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 355 (6th Cir. 2015) (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012)) (internal quotation marks omitted). A school may be required to make "reasonable" modifications, but is not required to make modifications deemed "fundamental" or "substantial." *Kaltenberger*, 162 F.3d at 436 (quoting *Choate*, 469 U.S. at 300). *See also Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 186–87 (2d Cir. 2015) ("[W]hile a covered entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice.") (internal quotation marks omitted).

The Sixth Circuit has analyzed claims under the ADA and Rehabilitation Act together given the general equivalency of their provisions. *See Kaltenberger*, 162 F.3d at 435. To establish a *prima facie* case of discrimination, Plaintiff must demonstrate that "he (1) is disabled under the statutes, (2) is 'otherwise qualified' for participation in the program, and (3) 'is being excluded from participation in, denied the benefits of, or subjected to discrimination' because of his disability or

handicap,[10] and (4) (for the Rehabilitation Act) that the program receives federal financial assistance."[11] *Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016).

### 1. Whether Plaintiff Had A Protected Disability

To sustain his disability claims, Plaintiff must first prove that he was disabled or handicapped under the ADA and Rehabilitation Act.

"A publicly funded university is not required to provide accommodation to a student under the ADA or Rehabilitation Act until the student provides a proper diagnosis of his claimed disability and specifically requests an accommodation." *Carten v. Kent State Univ.*, 78 Fed. App'x. 499, 500–01 (6th Cir. 2003). During Plaintiff's time at the medical school, he provided the medical school with documentation for his diagnoses of severe depression and moderate severe anxiety.[12] Dkt. No. 70-46, p. 3 (Pg. ID 1887); Dkt. No. 83-2, p. 5 (Pg. ID 2358). In January 2015, Plaintiff provided SDS with documentation from his therapist for an anxiety disorder, for which he was accommodated by 150% time on tests and a

---

[10] Section 504 of the Rehabilitation Act requires that Plaintiff have been subject to discrimination from the medical school solely by reason of his disability. 29 U.S.C. § 794(a). The ADA more broadly prohibits exclusion if Plaintiff's disability was a motivating factor in the determination. *See* 42 U.S.C. § 12132; *Kaltenberger*, 162 F.3d at 435.

[11] Defendants do not dispute that the Medical School receives federal financial assistance and is a public entity.

[12] Medical documentation created after Plaintiff's dismissal lists his diagnosis as Obsessive Compulsive Disorder. *See* Dkt. No. 70-51.

distraction-reduced testing environment. Dkt. No. 83-7, p. 5 (Pg. ID 2469). SDS sought updated documentation from Plaintiff because he was not meeting his exam schedule even with the accommodations provided, but Plaintiff did not provide it. *Id*. at 6–7.

For the purpose of these motions, the Court will assume that Plaintiff's anxiety disorder was a qualifying disability or handicap because he was offered accommodations from SDS for that disorder.[13] *But see McGuinness v. Univ. of New Mexico Sch. of Med.*, 170 F.3d 974, 977 (10th Cir. 1998) (affirming that a medical student with an "anxiety disorder" limited to specific tests does not qualify as disabled under the ADA).

### 2.  Whether Plaintiff Is "Otherwise Qualified" to Continue

Second, Plaintiff must prove that he was "otherwise qualified," meaning that, with or without reasonable accommodation, he was able to perform the essential functions of the position. *See* 42 U.S.C. § 12131(2). "A plaintiff asserting a violation of the ADA or Rehabilitation Act bears the burden to establish that he is qualified." *Shaikh*, 608 F. App'x at 353 (quoting *Halpern*, 669 F.3d at 462). Plaintiff must present sufficient evidence to show he could satisfy the program's necessary requirements, or that any reasonable accommodation by the school

---

[13] There is also evidence in the record that the documentation that Plaintiff provided to SDS was insufficient because it did not provide an official diagnosis from a qualified evaluator. Dkt. No. 82-8.

would enable him to meet these requirements. *Id*. Courts are to give deference to professional academic judgments when evaluating the reasonable accommodation requirement. *Id*. For the reasons stated below, Plaintiff has not presented evidence that he was "otherwise qualified."

### a. The Medical School's Technical Standards and Professionalism Requirements

The medical school's Policy and Procedure Manual states in its Technical Standards for MD candidates:

> The candidate must possess the emotional health required for full utilization of his/her intellectual abilities, the exercise of good judgment, the prompt completion of all responsibilities attendant to the diagnosis and care of patients, and the development of mature, sensitive, and effective relationships with patients. The candidate must be able to tolerate physically taxing workloads and to function effectively under stress. He/she must be able to adapt to changing environments, to display flexibility, and to learn to function in the face of uncertainties inherent in the clinical problems of patients. Compassion, integrity, concern for others, interpersonal skills, interest and motivation are all personal qualities that will be assessed during the admissions and educational processes.

Dkt. No. 83-28, p. 13 (Pg. ID 2886). The Technical Standards require not only that students exercise good judgment, but also that students be able to function effectively under stress. Plaintiff's therapist describes Plaintiff's anxiety as causing him to react impulsively and make poor decisions. Dkt. No. 70-13. By the evidence Plaintiff submitted, he did not satisfy the Technical Standards the medical school required because he could not exercise good judgment while under stress.

Additionally, the medical school's professionalism requirements state that students are to demonstrate personal responsibility and honesty. Dkt. No. 83-28, pp. 74–75 (Pg. ID 2947–48). According to Plaintiff's therapist, Plaintiff also "has difficulty for assuming responsibility for his role in the issues that are occurring in his academic program . . . and his personality prevents him from acknowledgement of his responsibility at times and therefore he feels victimized." Dkt. No. 70-46, p. 2 (Pg. ID 1886). It is further undisputed that Plaintiff paid a friend to falsify a police report[14] and then submitted this report to the school to substantiate an absence. Dkt. No. 83-26, p. 59 (Pg. ID 2816). *See also Halpern*, 669 F.3d at 465 (observing that " 'misconduct—even misconduct related to a disability—is not itself a disability' and may be a basis for dismissal."). Plaintiff has not provided evidence that he exhibited the personal responsibility and honesty required to satisfy the medical school's professionalism requirements.

### b.  The Accommodations Plaintiff Requested

Plaintiff first submitted a doctor's note requesting a "relaxed schedule and flexible timing" in late November 2012, shortly after he accepted the school's offer to be placed on a decelerated program that cut his course load in half. Dkt. No. 70-19, p. 2 (Pg. ID 1775); Dkt. No. 70-21. Plaintiff did not make an appointment with SDS and Connors did not remind him of the proper procedure to request formal,

---

[14] Defendants also argue that this act was less impulsive than it was a calculated and premeditated act of dishonesty. Dkt. No. 70, p. 47 (Pg. ID 1637).

specific accommodations through SDS. Plaintiff took part in the decelerated program from November 2012 to August 2014. Dkt. No. 70-19, p. 2 (Pg. ID 1775); Dkt. No. 83-24, p. 2 (Pg. ID 2708). Such decelerated programs have been considered to qualify as an accommodation for disabled medical students. *See Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1048 (9th Cir. 1999). This program unquestionably relaxed Plaintiff's schedule by giving him half of the courses and exams per year, compared to his fellow Year 1 students. While on the decelerated program, Plaintiff was able to pass all his Year 1 classes. Dkt. No. 83-24, p. 2 (Pg. ID 2708). Further, Plaintiff was not reported for additional professionalism violations while in the decelerated program. *See id*. It seems as though his accommodation, although Plaintiff later regretted accepting it, was effective at enabling Plaintiff's participation at the medical school.

However, the medical school only offers a decelerated program for Year 1 students, and Plaintiff was placed back on a traditional track for Year 2. During his Year 2, Plaintiff requested numerous accommodations, including: (1) a "flexible testing schedule," apparently including the ability to select his own exams dates and the unlimited right to cancel and reschedule make-up exams at-will; (2) additional time for exams; (3) the ability to select the room in which he takes exams; (4) the ability to select the time his exams begin; (5) the ability to select the proctor who administers his exams; (6) the right to take exams in a room alone;

(7) that professors and administrators not be allowed to email him before or during the day of his exams; (8) an "alternative testing format," providing him paper exams instead of computerized exams because he was afraid of being given the wrong exam; and (9) that exams he did not pass be waived or nullified. *See* Dkt. No. 70-26, pp. 2–3 (Pg. ID 1794–95); Dkt. No. 70-48, p. 4 (Pg. ID 1897); Dkt. No. 83-2, p. 5 (Pg. ID 2358); Dkt. No. 82-6; Dkt. No. 82-8; Dkt. No. 82-15.

In December 2014, Plaintiff first visited SDS and was provided with 150% exam time and a distraction-reduced testing environment. Dkt. No. 83-7, p. 5 (Pg. ID 2469); Dkt. No. 70-25 (requesting only extended time and a reduced-distraction environment as accommodations). The medical school engaged in the interactive process when it allowed Plaintiff to provide input on when his make-up exams were to be scheduled and provided him with a later start time on exams. *See* Dkt. No. 82-5 (documenting DeVore's understanding that the school had constructed an academic and treatment plan for Plaintiff's disability, which Plaintiff agreed to adhere to); Dkt. No. 82-8, p. 2 (Pg. ID 2240) (noting that Plaintiff had been granted a later exam start time).

Even when the school gave Plaintiff the accommodations beyond what his outdated medical documentation supported, he was unable to take his exams in a timely manner and exercise professionalism at the level the medical school required. Dkt. No. 82-11 (documenting that Plaintiff continued to miss exams after

agreeing to no more absences from his custom exam schedule); Dkt. No. 70-10, p. 3 (Pg. ID 1681) (stating that Plaintiff emailed the falsified police report on January 12, 2015). Further, he continued to struggle academically after receiving accommodations. Dkt. No. 70-28 (indicating Plaintiff received a below average grade or failed every course in 2014–15); Doc No. 70-30 (noting Plaintiff took exams for Immunology/Microbiology in January 2015 and did not receive a passing grade); Dkt. No. 82-18 (reporting that Plaintiff passed a computerized exam, but failed a non-computerized practical exam in Physical Diagnosis).

Plaintiff has not shown that any of the many accommodations he requested would remedy his deficiencies in the above technical or professionalism criteria, or that these accommodations enabled him to complete exams in a timely manner. Allowing Plaintiff to select the date, time, place, and individuals involved in administering his exams and the material upon which an exam was printed would not have changed the fact that his anxiety causes him to make impulsive, poor decisions when he is under stress, and that his personality prevents him from acknowledging responsibility for his role in conflicts.

Adopting an appropriately deferential view, the Court finds that the school's technical standards and professionalism requirements were essential to the program and that, with or without an accommodations, Plaintiff could not satisfy these requirements. Having found that Plaintiff has failed to carry the burden of

demonstrating that he was otherwise qualified, the Court will not analyze whether his dismissal was causally connected to his disability, or pretext for discrimination. The Court will grant Defendants summary judgment on Plaintiff's disability claims.

## IV. CONCLUSION

Accordingly, for the reasons discussed herein, the Court **GRANTS** Defendants' Motion for Summary Judgment [70] and **DENIES** Plaintiff's Motion for Partial Summary Judgment [72].

**IT IS SO ORDERED.**

Dated:        June 8, 2017

s/Gershwin A. Drain
HON. GERSHWIN A. DRAIN
United States District Court Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
June 8, 2017, by electronic and/or ordinary mail.
/s/ Shawna C. Burns
Case Manager Generalist